80 P.3d 20

**In the Interest of Jane DOE, Born on November 11, 2000, FC–S No. 00–07042,**

**and**

**In the Interest of John Doe, Born on March 18, 1995, FC–S No. 00–07041.**

**Nos. 24736, 24737.**

Intermediate Court of Appeals of Hawai'i.

Nov. 5, 2003.

Jeffry R. Buchli, Honolulu, on the briefs, for Mother–Appellant.

M. Cora Avinante, on the briefs, for Father 2–Appellant.

Susan Barr Brandon, Jay K. Goss, Mary Ann Magnier, Deputy Attorneys General, on the briefs, for Department of Human Services–Appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by BURNS, C.J.

In appeal No. 24736 involving Jane Doe (Jane), born on November 11, 2000, the mother (Mother), on December 4, 2001, and the father (Father 2), on December 5, 2001, appeal from (a) the October 18, 2001 "Order Awarding Permanent Custody" and (b) the November 6, 2001 "Order Denying Motion for Reconsideration of Decision and Order Issued on October 18, 2001," entered by Judge John C. Bryant, Jr. In appeal No. 24737 involving John Doe (John), born on March 18, 2001, Mother appeals from (a) the October 18, 2001 "Order Awarding Permanent Custody" and (b) the November 6, 2001 "Order Denying Motion for Reconsideration of Decision and Order Issued on October 18, 2001," entered by Judge Bryant. John's father (Father 1) is not a party in this appeal. We affirm.

## BACKGROUND

On October 4, 2000, Appellee State of Hawai'i, Department of Human Services (DHS) received an anonymous report of the neglect of John by Mother and John's maternal grandmother (Grandmother).

When Jane, the daughter of Mother and Father 2, was born, she and Mother tested positive for methamphetamine. Mother took methamphetamine the day Jane was born. At the time, Mother was twenty-one years of age, was on probation for the offenses of Burglary and Attempted Burglary in the First Degree originating in 1998 and 1999, and was living with Grandmother and maternal grandfather (Grandfather). Father 2 was on parole for having committed the offenses of Robbery in the First Degree in 1981 and Robbery in the Second Degree and Possession of Prohibited Firearm in 1981.

On November 17, 2000, the DHS filed a Petition for Family Supervision of Jane (FC–S No. 00–07042) and a similar Petition for Family Supervision of John (FC–S No. 00–07041).

In each case, the Findings of Fact and Conclusions of Law were entered on January 17, 2002. The following are relevant findings of fact (FsOF) entered in each case:

21. On January 11, 2001 [John and Jane (the Children) ] were removed from the family home, and foster custody was assumed by DHS, due to neglect and threatened harm from Mother's continued drug use and [Grandmother's] lack of protectiveness of [the Children].

22. About one week prior to [the Children's] removal from the family home, Mother had been discharged·from the Hina Mauka outpatient drug treatment program for repeated absences and relapses on crystal methamphetamine.

23. When [the Children] were removed from the family home, the DHS social worker observed that [Jane] was in a very dirty condition with dirt between her toes and in the creases of her body and under her fingernails and toenails.

24. When [the Children] were removed from the family home, the DHS social worker found that [Jane] had been left in the primary care of Mother, who was still using crystal methamphetamine, even though the social worker had asked [Grandmother] to supervise Mother and be the primary caretaker of the child.

25. When [the Children] were removed from the family home, the DHS social worker observed [Jane] to be very passive and appeared underweight for a baby of her age.

26. When [the Children] were removed from the family home, the DHS social worker learned that [Jane] had not been taken for a check-up appointment with her pediatrician.

27. When [Jane] was placed in foster care her health was a matter of grave concern because she did not initially respond to feeding or show awareness of her surroundings, due to under-stimulation while in Mother and [Grandmother's] care.

28. After [the Children] were placed in foster care, [John] was discovered to have severe dental needs requiring a specialist, due to long-term neglect occurring while he was in Mother and [Grandmother's] care.'

29. After [the Children] were placed in foster care, the DHS social worker learned that [John] suffered educational neglect from not only not attending kindergarten, but also because he did not have basic skills such as knowing his colors or the alphabet or shapes or how to hold a pencil or crayon correctly, and he would not be ready for first grade in the Fall.

The petitions were heard and sustained by court orders entered on November 27, 2000. The DHS was awarded family supervision of the Children. On November 29, 2000, pursuant to Hawai'i Revised Statutes (HRS) § 587–34 (1993), the court appointed a guardian ad litem (GAL) for the Children.

At a December 13, 2000 hearing, family supervision was continued. Judge Karen M. Radius warned Mother that "most babies that are born with ice in their system immediately go to a foster home. And—or stay with Grandma and Mom is required to move out. This is only going to work so long as you really honestly go and participate in treatment."

On January 26, 2001, the court heard a Motion for Immediate Review filed by the DHS on January 24, 2001. The parents were not present at the hearing. The court continued family supervision.

On July 13, 2001, Judge Bryant heard the Intervener's Motion for Custody Pendente Lite and Motion to Intervene filed on May 24, 2001, by Grandmother and Grandfather. Judge Bryant denied the motion, noting that the Children had been neglected while with Mother in the home of Grandmother and Grandfather.

At a September 20, 2001 hearing, Father 1 agreed to the termination of his parental rights to John. Mother asked "the State to seriously look at considering placing both children with [unidentified 'relatives'] in Tennessee" who allegedly were willing to take both children. Judge Bryant explained that placement would be based on the best interest of the Children.

The following are relevant FsOF entered in each case:

38. On or about March 30, 2001, Mother was incarcerated after an arrest for the offense of Unauthorized Control of a Propelled Vehicle.

39. On August 21, 2001, Mother was sentenced in the UCPV case to an indeterminate term of no more than five years with a two year mandatory minimum term of imprisonment.

40. With credit for time served Mother will be eligible for parole no earlier than on or about March 30, 2003.

41. On August 21, 2001, Mother's probation was revoked and she was sentenced to concurrent indeterminate terms of imprisonment of no more than ten years in her two other felony cases.

The following are FsOF entered in Jane's case:

45. [Father 2] failed to appear at a psychological evaluation scheduled by DHS to identify any additional services to enable him to become able to provide a safe family home for [Jane].

46. [Father 2] did not make contact with the DHS case manager or show any interest in [Jane] until late July of 2001, and did not accomplish any part of his service plans, the significance of which is that the problems identified by DHS in the petition have not been addressed and resolved.

47. On August 14, 2001, [Father 2] was incarcerated after being convicted by a jury of the felony offense of Unauthorized Control of a Propelled Vehicle.

48. On November 6, 2001, [Father 2] was sentenced to an indeterminate extended term of no more than ten years with a mandatory minimum term of imprisonment of one year and eight months.

49. By his own estimate of credit for time served, at best [Father 2] will be eligible for parole no earlier than July of 2002.

50. [Father 2] will require a minimum of eight to twelve months of services at best upon his release from incarceration.

The Motion for Order Awarding Permanent Custody and Establishing a Permanent Plan was filed by the DHS on August 13, 2001, and heard on October 18, 2001. It sought the award of permanent custody of the Children to the DHS with the subsequent goal of adoption. The GAL appeared in favor of the motion.

On the subject of the possible placement of the Children with other members of their "family," the DHS social worker expressed concerns about the family members participating in a "holding pattern in that their concern is not to have permanency." In her words, their "intention is to take the Children and return them to the parents when they're no longer incarcerated." The social worker explained that Jane has already "bonded where she is and it's a very appropriate home for her." [1]

At the conclusion of the hearing on October 18, 2001, Judge Bryant orally stated, in relevant part:

> The motion for permanent custody is granted.... The Court further finds that the permanent plan is in the best interest of the Children.

> There should be no referral made to family members unless I authorize it. · If you find good family members that are better than these foster parents, let me know.

> Children are not to be removed from current foster family placement without prior Court approval unless there's an immediate risk of harm shown, which I do not expect to happen.

At the conclusion of the hearing on October 18, 2001, Judge Bryant entered the Order Awarding Permanent Custody terminating the parental rights of Mother and Father 2, appointing DHS as permanent custodian of the Children, ordering the August 6, 2001 Permanent Plan and its goal of adoption into effect, and ordering that:

17. DHS shall not remove [the Children] from the present foster home without court approval unless an imminent risk of harm is presented.

18. DHS shall not refer to ICPC [Interstate Compact for Placement of Children, HRS § Chapter 350E (1993) ] family placement without court approval.

---

1. At the October 18, 2001 hearing, the father (Father 2) of Jane Doe (Jane), born on November 11, 2000, stated that he had an unmarried sister in Oklahoma who was willing to "keep" Jane. In a report filed on January 18, 2002, the Guardian Ad Litem for Jane reported having a conversation with Father 2's sister (Aunt). After reading the court reports and realizing that Jane had been in a pre-adoptive home for most of her life, Aunt stated that she was not interested in taking Jane away from a stable, loving home.

The following are relevant FsOF entered by the family court in each case:

43. Mother is not presently willing and able to provide [the Children] with a safe family home, even with the assistance of a service plan, because of her unavailability due to her incarceration, and her other problems.

44. It is not reasonably foreseeable that Mother will become willing and able to provide [the Children] with a safe family home, even with the assistance of a service plan, within a reasonable period of time because, based on the length of her sentence and her lack of progress as of the time of trial, it cannot be predicted that she will be released from incarceration and sufficiently resolve her problems within a reasonable period of time.

The following are relevant FsOF entered by the family court in Jane's case:

51. [Father 2] is not presently willing and able to provide [the Children] with a safe family home, even with the assistance of a service plan, because of his unavailability due to his incarceration, and his other problems.

52. It is not reasonably foreseeable that [Father 2] will become willing and able to provide [the Children] with a safe family home, even with the assistance of a service plan, within a reasonable period of time because, based on the length of his sentence and his lack of progress as of the time of trial, it cannot be predicted that he will be released from incarceration and sufficiently resolve his problems within a reasonable period of time.

53. Given the age of [Jane] and her pressing need for a strong attachment to a nurturing primary caretaker in a permanent safe home, it is not reasonable to delay permanent custody for her parents to be given more time to address their problems.[2]

. . . .

55. The permanent plan proposed by DHS, which recommends adoption, is in the best interests of [Jane] because of her young age and her need for a permanent safe and secure home with responsible and competent parents and family.[3]

. . . .

60. Mother has made a series of criminal decisions in her life. Her testimony at trial was not credible and she does not begin to understand the harm that she has caused these children or what is in their best interest.[4]

The following conclusion of law (COL) was entered in Jane's case:

4. Having found and concluded that the legal requirements for termination of [Mother's] and [Father 2's] parental rights have been satisfied, the court now finds and concludes that the permanent plan is in the best interests of [Jane].

On November 5, 2001, Father 2 filed a Motion for Reconsideration of Order Awarding Permanent Custody, arguing that he should be given "a short time to engage and/or complete the services prior to the awarding of permanent custody." That same day, Judge Bryant entered the order denying this motion without hearing because "the instant pleadings failed to show good cause to warrant further hearing under Hawai'i Family Court Rule [ (HFCR) ] 69(j)."

On November 6, 2001, Mother filed a Motion for Reconsideration, arguing that

[t]he motion for permanent custody was filed, as well as the trial held, prior to the expiration of one year. This is not a 'reasonable period of time' under the facts surrounding the case. Mother was never offered services will [sic] incarcerated, and should have been given the opportunity to engage in services while imprisoned. Therefore, she was not given the 'assis-

___

2. The corresponding Finding of Fact (FOF) entered in the case of John Doe (John), born on March 18, 1995, is almost the same: "Given the age of [John] and his need for a strong attachment to a nurturing primary caretaker in a permanent safe home, it is not reasonable to delay

permanent custody for his parents to be given more time to address their problems."

3. In John's case, this was FOF no. 49.

4. In John's case, this was FOF no. 54.

tance of a service plan' to provide a 'safe family home' pursuant to HRS Chapter 587. Her parole hearing is scheduled for the end of November, 2001 and will have a decision form [sic] the parole board by December, 2001 as to her status and any remaining time she will have to be incarcerated.

That same day, Judge Bryant entered the order denying Mother's motion without hearing because "the instant pleadings failed to show good cause to warrant further hearing under Hawai'i Family Court Rule 69(j)."

### STANDARDS OF REVIEW

■ Generally, the "family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion." *In re Jane Doe*, 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996) (quoting *In re Jane Doe*, 77 Hawai'i 109, 115, 883 P.2d 30, 36 (1994)) (internal quotation marks and citation omitted).

■ The family court's determinations pursuant to HRS § 587-73(a) with respect to (1) whether a child's parent is willing and able to provide a safe family home for the child and (2) whether it is reasonably foreseeable that a child's parent will become willing and able to provide a safe family home within a reasonable period of time are reviewed on appeal under the "clearly erroneous" standard. *In re John Doe*, 89 Hawai'i 477, 486-87, 974 P.2d 1067, 1076-77 (App. 1999).

■ A finding of fact "is clearly erroneous when (1) the record lacks substantial evidence to support the finding or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (citation omitted).

■ Conclusions of law are reviewed *de novo* under the right/wrong standard. *In re Jane Doe*, 84 Hawai'i at 46, 928 P.2d at 888 (citations omitted).

### DISCUSSION

#### 1.

Mother challenges FOF no. 55 and COL no. 4.[5] Mother contends that the family court abused its discretion:

by requiring its approval for the Children's family to be considered as potential permanent placements for the Children.

by requiring family members to be better than the Children's current foster parents before being considered as potential permanent placements for the Children.

by ordering DHS, the permanent custodian, not to remove the Children from their current foster placement without prior court approval unless there is an immediate risk of harm.

Mother complains that the "permanent plan proposed by DHS contemplates adoption by [the Children's] non-relative foster parents." She contends that the Children's "best interests are subject to the statutory priority of HRS Chapter 587 in favor of [the Children's] family. It is in [the Children's] best interests to be with their family."

HRS § 587-2 (1993) defines "family" as follows:

"Family" means each legal parent, the natural mother, the natural father, the adjudicated, presumed, or concerned natural father as defined under section 578-2, each parent's spouse, or former spouses, each sibling or person related by consanguinity or marriage, each person residing in the same dwelling unit, and any other person who or legal entity which is a child's legal or physical custodian or guardian, or who is otherwise responsible for the child's care, other than an authorized agency which assumes such a legal status or relationship with the child under this chapter.

Father 2 contends that the record lacks clear and convincing evidence that he was not willing and able to provide Jane with a safe home with the assistance of a service

---

5. Mother also challenges Findings of Fact nos. 11, 12, 13, 14, 15, and 16, each on the basis that "[n]owhere in the record does the court make this finding." These challenges lack merit. The court makes the findings in the quoted findings of fact.

plan. Father 2 alleges that when he is released from prison, he will be able, with the help of his sister, to provide a safe home for Jane.

HRS § 587-2 (1993) states, in relevant part, that " '[f]amily home' means the home of the child's legal custodian where there is the provision of care for the child's physical and psychological health and welfare."

Prior to its repeal in 1998, HRS § 587-73(e) stated that the "court shall order a permanent plan for the child within three years of the date upon which the child was first placed under foster custody by the court, if the child's family is not willing and able to provide the child with a safe family home, even with the assistance of a service plan." In those days, pursuant to Act 316, 1986 Haw. Sess. L. Act 316, § 1 at 631, HRS § 587-1 stated the policy of the law, in relevant part, as follows:

> This permanent planning should effectuate placement with a child's own family when possible and should be conducted in an expeditious fashion so that where return to the child's family is not possible as provided in this chapter, such children with be promptly and permanently placed with responsible, competent, substitute parents and families, and their place in such families secured by adoption or permanent custody orders.

This court's opinion in *In the Interest of Jane Doe*, 7 Haw.App. 547, 556, 784 P.2d 873, 879-80 (1989), was based on that 1988 statute and policy and states, in relevant part:

> Under HRS § 571-46, the determining factor with respect to child custody is the best interests of the child. *Fujikane v. Fujikane*, 61 Haw. 352, 604 P.2d 43 (1979). On the subject of best interests, HRS § 571-46(1) accords priority to the child's parents. HRS Chapter 587 accords priority to the child's family as defined in HRS § 587-2, *supra*. There are no other statutory priorities. Thus, when HRS § 571-46(2) authorizes the award of custody to "[a]ny person who has had de facto custody of the child in a stable and wholesome home and is a fit and proper person" it does so only "whenever such award serves the best interest of the child", subject to

the statutory priority in favor of the child's parents and family.

Foster Caretakers are neither parents nor family. Doe was initially in DHS's temporary foster custody and foster custody. During that time, HRS § 587-2 authorized DHS "[t]o determine where and with whom the child shall be placed in emergency foster care or foster care[.]" Later, when Doe was in DHS's permanent custody, HRS § 587-2 authorized DHS "[t]o determine where and with whom the child shall live[.]" Therefore, DHS did not need the family court's approval prior to implementing its decision to move Doe.

Based on the above, Mother argues that HRS § 587-1 gives priority to the family with respect to the permanent placement of the Children and that "there are no other statutory priorities."

In 1998, however, the legislature substantially amended HRS § 587-1 and the policy of the law. HRS § 587-1 (Supp.2002) is the result of Act 134, § 6, 1998 Haw. Sess. L. Act 134m § 1 at 504 (1998 Act 134), which was the result of S.B. No. 2987. The House Conference Committee Report 38 on S.B. No. 2987 states that:

> The purpose of this bill is to reform the child protective services system to afford greater emphasis on the safety of the abused child.... The family unit should be the focus of attention to prevent child abuse. A cohesive and functional family is the best solution to child abuse prevention. Your Committee is not unmindful that this is a utopian concept in today's society, so this measure emphasizes the safety of the child over reunification of the family. In matters involving human behavior and attitudes, as in child abuse, legislation is limited to enacting proscriptive legislation, as in protection of the child.

Hse. Stand. Comm. Rep. No. 2987, in 1998 House Journal at 962.

1998 Act 134 states, in relevant part, that

> The legislature finds that child abuse has become a serious problem which requires broad-based community action to prevent children from becoming innocent victims. Recent trends across the country

in dealing with this problem have been to provide alternatives to the traditional philosophy of returning the abused child to the natural family, which may not be in the best interests of the child's safety. Providing a child with a safe home should be the ultimate concern, regardless of whether a safe home be the natural family, adoptive family, or foster family.

Pursuant to 1998 Act 134, HRS § 587–1 (Supp.2002) now states as follows:

**Purpose; construction.** This chapter creates within the jurisdiction of the family court a child protective act to make paramount the safety and health of children who have been harmed or are in life circumstances that threaten harm. Furthermore, this chapter makes provisions for the service treatment, and permanent plans for these children and their families.

The legislature finds that children deserve and require competent, responsible parenting and safe, secure, loving, and nurturing homes. The legislature finds that children who have been harmed or are threatened with harm are less likely than other children to realize their full educational, vocational, and emotional potential, and become law-abiding, productive, self-sufficient citizens, and are more likely to become involved with the mental health system, the juvenile justice system, or the criminal justice system, as well as become an economic burden on the State. The legislature finds that prompt identification, reporting, investigation, services, treatment, adjudication, and disposition of cases involving children who have been harmed or are threatened with harm are in the Children's, their families', and society's best interests because the Children are defenseless, exploitable, and vulnerable.

The policy and purpose of this chapter is to provide children with prompt and ample protection from the harms detailed herein, with an opportunity for timely reconciliation with their families if the families can provide safe family homes, and with timely and appropriate service or permanent plans to ensure the safety of the child so they may develop and mature into responsible, self-sufficient, law-abiding citizens.

The service plan shall effectuate the child's remaining in the family home, when the family home can be immediately made safe with services, or the child's returning to a safe family home. The service plan should be carefully formulated with the family in a timely manner. Every reasonable opportunity should be provided to help the child's legal custodian to succeed in remedying the problems which put the child at substantial risk of being harmed in the family home. Each appropriate resource, public and private, family and friend, should be considered and used to maximize the legal custodian's potential for providing a safe family home for the child. Full and careful consideration should be given to the religious, cultural, and ethnic values of the child's legal custodian when service plans are being discussed and formulated. Where the court has determined, by clear and convincing evidence, that the child cannot be returned to a safe family home, the child will be permanently placed in a timely manner.

The department's child protective services provided under this chapter shall make every reasonable effort to be open, accessible, and communicative to the persons affected in any manner by a child protective proceeding; provided that the safety and best interests of the child under this chapter shall not be endangered in the process.

This chapter shall be liberally construed to serve the best interests of the Children and the purposes set out in this chapter.

HRS § 587–73 (Supp.2002) states the standards for determining whether and what permanent plans should be implemented:

**Permanent plan hearing.** (a) At the permanent plan hearing, the court shall consider fully all relevant prior and current information pertaining to the safe family home guidelines, as set forth in section 587–25, including but not limited to the report or reports submitted pursuant to section 587–40, and determine whether there exists clear and convincing evidence that:

(1) The child's legal mother, legal father, adjudicated, presumed, or concerned

natural father as defined under chapter 578 are not presently willing and able to provide the child with a safe family home, even with the assistance of a service plan;

(2) It is not reasonably foreseeable that the child's legal mother, legal father, adjudicated, presumed, or concerned natural father as defined under chapter 578 will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time which shall not exceed two years from the date upon which the child was first placed under foster custody by the court;

(3) The proposed permanent plan will assist in achieving the goal which is in the best interests of the child; provided that the court shall presume that:

(A) It is in the best interests of a child to be promptly and permanently placed with responsible and competent substitute parents and families in safe and secure homes; and

(B) The presumption increases in importance proportionate to the youth of the child upon the date that the child was first placed under foster custody by the court; and

(4) If the child has reached the age of fourteen, the child consents to the permanent plan, unless the court, after consulting with the child in camera, finds that it is in the best interest of the child to dispense with the child's consent.

(b) If the court determines that the criteria set forth in subsection (a) are established by clear and convincing evidence, the court shall order:

(1) That the existing service plan be terminated and that the prior award of foster custody be revoked;

(2) That permanent custody be awarded to an appropriate authorized agency;

(3) That an appropriate permanent plan be implemented concerning the child whereby the child will:

(A) Be adopted pursuant to chapter 578; provided that the court shall presume that it is in the best interests of the child to be adopted, unless the child is or will be in the home of family or a person who has become as family and who for good cause is unwilling or unable to adopt the child but is committed to and is capable of being the child's guardian or permanent custodian;

(B) Be placed under guardianship pursuant to chapter 560; or

(C) Remain in permanent custody until the child is subsequently adopted, placed under a guardianship, or reaches the age of majority, and that such status shall not be subject to modification or revocation except upon a showing of extraordinary circumstances to the court;

(4) That such further orders as the court deems to be in the best interests of the child, including, but not limited to, restricting or excluding unnecessary parties from participating in adoption or other subsequent proceedings, be entered; and

(5) Until adoption or guardianship is ordered, that each case be set for a permanent plan review hearing not later than one year after the date that a permanent plan is ordered by the court, or sooner if required by federal law, and thereafter, that subsequent permanent plan review hearings be set not later than each year, or sooner if required by federal law; provided that at each permanent plan review hearing, the court shall review the existing permanent plan and enter such further orders as are deemed to be in the best interests of the child.

(c) If the court determines that the criteria set forth in subsection (a) are not established by clear and convincing evidence, the court shall order that:

(1) The permanent plan hearing be continued for a reasonable period of time not to exceed six months from the date of the continuance or the case be set for a review hearing within six months;

(2) The existing service plan be revised as the court, upon such hearing as the court deems to be appropriate and after ensuring that the requirement of section 587–71(h) is satisfied, determines to be in the best interests of the child; provided that a copy of the revised service plan shall be incorporated as part of the order;

(3) The authorized agency submit a written report pursuant to section 587–40; and

(4) Such further orders as the court deems to be in the best interests of the child be entered.

(d) At the continued permanent plan hearing, the court shall proceed pursuant to subsections (a), (b), and (c) until such date as the court determines that:

(1) There is sufficient evidence to proceed pursuant to subsection (b); or

(2) The child's family is willing and able to provide the child with a safe family home, even with the assistance of a service plan, upon which determination the court may:

(A) Revoke the prior award of foster custody to the authorized agency and return the child to the family home;

(B) Terminate jurisdiction;

(C) Award family supervision to an authorized agency;

(D) Order such revisions to the existing service plan as the court, upon such hearing as the court deems to be appropriate and after ensuring that the requirement of section 587–71(h) is satisfied, determines to be in the best interests of the child; provided that a copy of the revised service plan shall be incorporated as part of the order;

(E) Set the case for a review hearing within six months; and

(F) Enter such further orders as the court deems to be in the best interests of the child.

HRS § 587–25 (1993) specifies:

Safe family home guidelines. (a) The following guidelines shall be fully considered when determining whether the child's family is willing and able to provide the child with a safe family home:

(1) The current facts relating to the child which include:

(A) Age and vulnerability;

(B) Psychological, medical and dental needs;

(C) Peer and family relationships and bonding abilities;

(D) Developmental growth and schooling;

(E) Current living situation;

(F) Fear of being in the family home; and

(G) Services provided the child

. . . .

(3) Date(s) and reason for child's placement out of the home, description, appropriateness, and location of the placement and who has placement responsibility

(4) Historical facts relating to the alleged perpetrator and other appropriate family members who are parties which include:

. . . .

(D) Prior involvement in services;

. . . .

(7) Whether there is a history of substance abuse by the child's family or others who have access to the family home;

. . . .

(9) Whether the non-perpetrator(s) who resides in the family home has demonstrated an ability to protect the child from further harm and to insure that any current protective orders are enforced;

(10) Whether there is a support system of extended family and/or friends available to the child's family;

(11) Whether the child's family has demonstrated an understanding and utilization of the recommended/court ordered services designated to effectuate a safe home for the child;

(12) Whether the child's family has resolved or can resolve the identified safe-

ty issues in the family home within a reasonable period of time;

(13) Whether the child's family has demonstrated the ability to understand and adequately parent the child especially in the areas of communication, nurturing, child development, perception of the child and meeting the child's physical and emotional needs; and

(14) Assessment (to include the demonstrated ability of the child's family to provide a safe family home for the child) and recommendation.

(b) The court shall consider the likelihood that the current situation presented by the guidelines set forth in subsection (a) will continue in the reasonably foreseeable future and the likelihood that the court will receive timely notice of any change or changes in the family's willingness and ability to provide the child with a safe family home.

■ Mother's recurring drug problems, Mother's and Father 2's inability while they are in prison to care for John and/or Jane, the additional time needed for Mother and Father 2 to go through services in order to acquire the necessary parenting skills, the likelihood that Mother and Father 2 will not acquire those parenting skills, and the general neglect the Children had suffered while in the home of Grandmother and Grandfather, demonstrate the inability of Mother and Father 2 to provide a safe family home for the Children and support the family court's decision.

Finally, Mother disputes the authority of the family court to instruct the DHS that:

There should be no referral made to family members unless I authorize it. If you find good family members that are better than these foster parents, let me know. Children are not to be removed from current foster family placement without prior Court approval unless there's an immediate risk of harm shown, which I do not expect to happen.

Mother also disputes the authority of the family court to order that the "DHS shall not remove the child from the present foster home without court approval unless a ...

risk of harm is presented. DHS shall not refer for ICPC or family placement without court approval."

Mother argues that according to *Doe*, "when DHS has permanent custody, it is authorized by HRS § 587-2 'to determine where and with whom the child shall live'" and, therefore, the family court abused its discretion when it ordered that "the Children are not to be removed from their current foster family placements without prior Court approval." We disagree.

■ In defining "permanent custody," HRS § 587-2 (1993) states, in relevant part:

(1) Permanent custody divests from each legal custodian and family member who has been summoned pursuant to section 587-32(a), and vests in a permanent custodian each of the parental and custodial duties and rights of a legal custodian and family member, including, but not limited to the following:

(A) To determine where and with whom the child shall live; provided that the child shall not be placed outside the State without prior order of the court;

. . . .

(F) To provide the court with information concerning the child that the court may require at any time, and to submit written reports to the court stating the then-current situation and other significant information concerning the child at intervals not to exceed one year, unless otherwise ordered by the court;

Clearly, the permanent custodian's "duties and rights of a legal custodian and family member" are subject to the ultimate control of the family court.

It was within the family court's discretion to enter the challenged order. Jane was born on November 11, 2000. She had bonded with her foster parents and they were eager to adopt her. John required particular care because he had already been moved several times while in foster care and had settled in a stable family home. The family members pointed to by Mother and Father 2 resided out-of-state.

2.

While denying Mother's and Father 2's Motions for Reconsideration, the family court cited to nonexisting "HFCR Rule 69(j)[.]" If the family court was thinking of HFCR Rule 59(j), it erred because HFCR Rule 59(j) was deleted effective January 1, 2000.

[redacted] The family court violated HFCR Rule 59(e) (2003) when it, without a hearing, entered its November 6, 2001 "Order Denying Motion for Reconsideration of Decision and Order Issued on October 18, 2001" in both cases. HFCR Rule 59(e) states, "Excepting motions for reconsideration from proceedings based upon HRS sections 571–11(1), (2), (6) and (9), all motions for reconsideration shall be non-hearing motions." These are HRS § 571–11(9) proceedings. On the other hand, although Mother's and Father 2's motions for reconsideration qualified for a hearing, we conclude that the lack of that hearing in these cases was harmless.

[redacted] In *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, the Hawai'i Supreme Court explained that "[t]he purpose of a motion for reconsideration is to allow the parties to present new evidence and/or arguments that could not have been presented during the earlier, adjudicated motion." 74 Haw. 85, 114–15, 839 P.2d 10, 27 (1992). *See, e.g., Gossinger v. Assn. of Apartment Owners of Regency of Ala Wai,* 73 Haw. 412, 425–26, 835 P.2d 627, 634–35 (1992); *Briggs v. Hotel Corp. of the Pacific, Inc.,* 73 Haw. 276, 287, 831 P.2d 1335, 1342 (1992) ("A motion for reconsideration is not time to relitigate old matters.")

Mother's argument was as follows:

> The motion for permanent custody was filed, as well as the trial held, prior to the expiration of one year. This is not a "reasonable period of time" under the facts surrounding this case. Mother was never offered services will [sic] incarcerated, and should have been given the opportunity to engage in services while imprisoned. Therefore, she was not given the "assistance of a service plan" to provide a "safe family home" pursuant to HRS § 587.

Father 2's argument was that the "Court should reconsider its decision and [Father 2] should be given a short time to engage and/or complete the services, prior to the awarding of permanent custody." In essence, Mother wanted reconsideration of FOF no. 44 entered in each case and Father 2 wanted reconsideration of FOF no. 52 entered in Jane's case. Neither presented new evidence and/or arguments that were not presented in support of the earlier, adjudicated motion.

CONCLUSION

Accordingly, we affirm the October 18, 2001 "Order Awarding Permanent Custody" and the November 6, 2001 "Order Denying Motion for Reconsideration of Decision and Order Issued on October 18, 2001" entered in both cases.