322 P.3d 263

**In the Interest of AS.**

**No. SCWC–11–0001065.**

Supreme Court of Hawai'i.

Feb. 14, 2014.

Patrick A. Pascual, Honolulu, for petitioner.

Francis T. O'Brien, for respondents Foster Parents.

Kimberly S. Towler, for respondent Volunteer Guardian Ad Litem Program.

RECKTENWALD, C.J., NAKAYAMA, McKENNA, and POLLACK, JJ.; with ACOBA, J., concurring separately, with whom POLLACK, J., joins.

Opinion of the Court by McKENNA, J.

## I. Introduction

In this appeal, the Family Court of the First Circuit ("family court") awarded custody of AS, a minor foster child, to AS's non-relative foster parents, contrary to the De-

partment of Human Services' ("DHS") recommendation that AS be permanently placed with her maternal aunt. At issue in this appeal is whether the family court reviews DHS's permanent placement recommendations for children in foster care under an abuse of discretion or best interests of the child standard. The ICA chose the latter standard, holding, "[T]he family court, based on the evidence presented, must make its own determination regarding whether the placement of the child is in the child's best interest." *In re AS*, 130 Hawai'i 486, 506, 312 P.3d 1193, 1213 (App.2013). DHS now appeals. On certiorari, DHS presents four questions:

1. In ruling that DHS, as the permanent custodian of a child, did not have the discretion to determine a child's placement, did the ICA commit grave errors of law by:

a) Disregarding (and overturning) the Hawaii Supreme Court's ruling in *In re Doe*, 100 Hawai'i 335, 346 & [n.] 19, 60 P.3d 285, 296 & [n.] 19 (2002) that held when DHS is appointed the permanent custodian of a child, DHS has the discretion to determine the child's permanent placement?

b) Violating the rules of statutory interpretation when it erroneously held that while HRS § 587A–15(d)(2) gave DHS, as a child's permanent custodian, the duty and authority to determine a child's placement, DHS had no discretion because of the absence of the word "discretion?" Does the ICA's holding create absurd results, such as making the Judiciary, instead of DHS, the primary child-placing agency when children are placed in temporary foster, foster and permanent custody, notwithstanding contrary statutory language and legislative intent?

2. Did the ICA commit grave errors of law in ruling that the standard and burden of the family court's review of DHS' permanent placement decision required DHS to prove that its permanent placement decision was in the child's best interest, instead of placing the burden on the person challenging DHS' placement decision to prove that DHS abused its discretion in making its assessment? Was the ICA's ruling also inconsistent with the Supreme Court's ruling in *In re Doe[,]* 101 Hawai'i 220, 231, 65 P.3d 167, 178 (2003)?

3. Did the ICA commit grave errors of law in ruling that Federal and Hawaii law did not create relative/family placement preferences for children in foster care, including those in the permanent custody of DHS?

4. Did the ICA commit grave errors of law by ruling that the family court was not required to remove DHS as the child's permanent custodian after ruling that DHS abused its placement discretion?

Although we affirm the ICA's judgment on appeal, we also clarify the ICA's opinion to hold that (1) the party challenging DHS's permanent placement recommendation bears the burden of proving by a preponderance of the evidence that the permanent placement is not in the child's best interests; (2) as an agency with child welfare expertise, DHS, as permanent custodian of a child, has the discretion in the first instance to determine where and with whom a child shall live; (3) any relative placement preference found in Title IV–E of the Social Security Act does not condition the receipt of federal funds thereunder upon permanent placement of foster children with relatives; (4) there is no relative placement preference in Hawai'i Revised Statutes ("HRS") Chapter 587A (the "Child Protective Act" or "CPA") with regard to permanent placement of foster children; therefore, to the extent that DHS's Policy Directives PA Nos. 2005–5, –7, and –8 mandate such a preference, those policies impermissibly alter the CPA and its legislative history; and (5) *In re Doe*, 101 Hawai'i 220, 65 P.3d 167 (2003) ("*March 2003 Doe*") does not stand for the proposition that the family court must relieve DHS of its permanent custodianship if the family court disagrees with DHS's permanent placement decision.

## II. Background

### A. Factual Background and Family Court Proceedings

The following facts (except where supplemented in footnotes) were taken from the

family court's Findings of Fact and Conclusions of Law. On certiorari, none of the Findings of Fact are contested, and are, therefore, binding upon this court. *See Kelly v. 1250 Oceanside Partners,* 111 Hawai'i 205, 227, 140 P.3d 985, 1007 (2006).

[AS] was born on July 22, 2008. At birth she weighed 5 pounds, 10.9 ounces. She was drug exposed in utero. [AS] was taken into foster custody on July 24, 2008, via biological parents' voluntary foster custody agreement. [DHS] has been the case manager offering services and monitoring the delivery of services throughout this case. DHS filed a Petition for Foster Custody on August 7, 2008. Since July 2010, DHS has been [AS's] permanent custodian. The Volunteer Guardian Ad Litem ("VGAL") Program was appointed by the court to serve as [AS's] guardian ad litem on September 23, 2008.

[Foster Parents] are the licensed foster parents for [AS]. Foster Parents are not biologically related to [AS]. DHS placed [AS] with Foster Parents on July 24, 2008. DHS found this an appropriate home as "these foster parents have been fostering children for many years."

On or about August 28, 2008, DHS removed [AS] from Foster Parents' home and placed her in the home of family friends, who had previously been foster parents to one of [AS's] half-siblings.

Father appeared at a hearing with his court appointed attorney on October 8, 2008, and, after accepting Father's stipulation, the court took jurisdiction and awarded foster custody of [AS] to DHS.

On February 3, 2009, DHS removed [AS] from her foster home at the foster family's request because of the foster mother's health issues. DHS returned [AS] to [Foster Parents] "as they had told DHS that if [AS] needed a home, they would be happy to have her return. They are experienced foster parents and love [AS]." [AS] has continuously remained in her placement with Foster Par-

ents since she was returned to their home on February 3, 2009.

DHS filed its Motion for Order Awarding Permanent Custody and Establishing a Permanent Plan on June 19, 2009. At a June 29, 2009 court hearing, DHS submitted a proposed permanent plan, dated May 26, 2009. It recommended that permanent custody be awarded to DHS, stating that "DHS assesses that [AS] deserves to have a permanent home where all her needs will be consistently met as they have been since 7/24/08." The proposed permanent plan also stated:

> [AS's] current non-relative caregiver is interested in adoption and providing a permanent home for [AS]. The non-relative caregiver is willing to maintain family connections by supervising visits after adoption for father. As mother is incarcerated, foster mother is not permitted to bring [AS] into the facility. However, once mother is released, foster mother is willing to supervise visits with mother as well. An Ohana Conference is being requested for the family to meet the foster mother. Maternal relatives are either unwilling or unlicenseable to care for [AS]. Father has stated he has no relatives. This has been confirmed via EPIC family finding efforts.

In June 2009, [a DHS social worker assigned to AS's case] asked [one of the Foster Parents] if she and [the other Foster Parent] were interested in adopting [AS]. [Foster Parents] immediately indicated that they wanted to adopt [AS].

[AS's Maternal Aunt] is an intervening party, her motion to intervene having been granted on June 15, 2011. [Maternal Aunt] has lived on Maui with [her daughter] since December 2007. [Maternal Aunt] testified that in September or October 2008 she informed [AS's DHS social worker] that she was unable at the time to care for [AS]. [Maternal Aunt] applied to be a foster parent and was approved by DHS for placement of [AS] in October 2009.[1] Once [Maternal

---

1. Around this time, the Safe Family Home plan (providing for reunification with birth parents) and the permanency plan (recommending termination of the birth parents' parental rights) were running concurrently. Father was still attempting to reunify with AS. As a result, at an Octo-

ber 28, 2009 hearing, even though DHS had identified Maternal Aunt as a potential placement, DHS informed the family court that it was "going to hold off on moving the child until after the [termination of parental rights] trial so that father can continue his efforts to reunify, have

Aunt]'s home was approved for placement, DHS took the position that [AS] should be placed with her on Maui. In December 2009, pursuant to court order, [AS] began having regular visits with [Maternal Aunt].

Mother stipulated to the termination of her parental rights and after a trial on DHS's Motion for Order Awarding Permanent Custody and Establishing a Permanent Plan, Father's parental rights were terminated.[2]

Because of the differing positions of DHS and the VGAL regarding the placement of [AS], a placement trial was set for October 4, 2010. The placement trial commenced on October 3, 2011, continued on October 5, 2011, and was completed on October 6, 2011. The basic issue for the trial was whether [AS] should maintain her current placement in the [Foster Parents'] home or be moved to a placement with [Maternal Aunt] on Maui. DHS, as [AS's] permanent custodian, determined that it was in [AS's] best interests to be permanently placed with [Maternal Aunt]. [Maternal Aunt] agreed with DHS. The Foster Parents and the VGAL Program disagreed with DHS and sought an order from the court prohibiting DHS from removing [AS] from her placement with Foster Parents and making Foster Parents her permanent placement.

The court rendered its oral decision on October 31, 2011, reflected in its Order Re: Trial on Placement, filed November 18, 2011.[3]

At the time of the trial, [AS] had lived with Foster Parents for most of her life (approximately 34 of 39 months). [AS] views her current placement as her home. [AS] is bonded to all of the members of her foster home, including [Foster Parents and their children]. [AS] has a deep attachment to [one of the Foster Parents], who has been her primary caregiver for almost all of her life. [AS's] relationship with [Maternal Aunt] has developed into a strong one and she has formed a bond with [Maternal Aunt]. However, her relationship with Foster Parents is stronger than it is with [Maternal Aunt].

DHS supports placement of [AS] with [Maternal Aunt] because of its policy [4] in favor of

---

his visits." Father's attorney also requested that Father's visits be increased, and the family court granted the request. The family court ordered DHS to "make best efforts to increase visits between Father & [AS]." The DHS social worker supervisor assigned to AS's case also testified that when a court orders increased visits for a parent, "[i]t's almost impossible" for DHS to comply with that order and still place a child off island.

2. The Order Awarding Permanent Custody and Establishing a Permanent Plan were filed on July 19, 2010.

3. The Order Re: Trial on Placement states, in relevant part:
 1. DHS shall maintain [AS's] placement in the ... foster home.
 2. [AS] shall not be removed from her current home except if there is imminent harm.
 3. DHS shall continue to provide visitation with [Maternal Aunt] and with [AS's] biological family on Oahu and her half-siblings, in consultation with the VGAL Program.
 4. DHS's oral motion to be relieved as [AS's] permanent custodian made after the Court announced its decision is denied.
 Paragraph 4 in the Order Re: Trial on Placement refers to the following exchange between the family court and counsel for DHS, which occurred after the family court rendered its oral decision on October 31, 2010:

[COUNSEL FOR DHS]: Your Honor, as a standing practice in my office, at this time the Department wishes to be relieved as permanent custodian of the child based on the Court's ruling [that DHS abused its discretion in recommending that AS be placed with Maternal Aunt].
THE COURT: To be relieved?
[COUNSEL FOR DHS]: Yes. And appoint ... [Foster Parents] as [AS's] permanent custodian.
THE COURT: Can you explain ... why the Department's making that motion?
[COUNSEL FOR DHS]: Well, it's basically the Court's ruling that we did abuse our discretion and it's basically a reflection on our fitness as permanent custodian, Your Honor. So it's standard practice coming out of my office in these situations to ask to be relieved of that—
THE COURT: Okay.
[COUNSEL FOR DHS]:—the Department be relieved of its obligation and appoint the resource parents as the permanent custodian.
THE COURT: At this point the Court will deny that motion.

4. The DHS Policy Directives Nos. PA 2005–5, 2005–7, and 2005–8 were admitted into evidence. DHS Policy Directive PA No.2005–5 is entitled "Supporting, Strengthening, and Maintaining Family Connections through Kinship

kin placements. [A DHS social worker] testified credibly on behalf of DHS that, but for the blood relationship between [AS] and [Maternal Aunt], DHS would not remove [AS] from the Foster Parents' home. [Another DHS social worker] testified credibly on behalf of DHS that, apart from [Maternal Aunt's] blood relationship to [AS], DHS believes that there is nothing else that distinguishes her home over Foster Parents' home. There is nothing about the quality of the care that [AS] has received in Foster Parents' home that requires the removal of [AS].

Removing [AS] from her placement with Foster Parents on Oahu for placement with [Maternal Aunt] on Maui will cause her to experience a sense of loss, because she is attached to her foster family, and it is impossible to predict how these losses will impact her as she gets older or how she will react to these losses. Removing [AS] from her placement with Foster Parents for placement with [Maternal Aunt] on Maui will be traumatic to [AS], even if the transition goes smoothly and she is able to maintain meaningful contact with her current foster family.

It would be harmful to [AS] if contact with her current foster family were not maintained after she was removed from their home. It would be extremely traumatic to [AS] were a placement with [Maternal Aunt] to fail for any reason. The trauma and loss [AS] will suffer if she is removed from her current placement, especially at this impor-

tant time in her life developmentally, is not in her best interests, even considering the fact that it means she will not be raised on a day to day basis by a member of her biological family. DHS has given inadequate weight to the loss and trauma that [AS] will suffer and the harm that removal from Foster Parents will cause. It is in the best interests of [AS] to remain in her placement with Foster Parents. It is not in [AS's] best interests to be removed from her placement with the Foster Parents and placed with [Maternal Aunt] on Maui. The application in this case of DHS's policy regarding placement with kin[,] considering all of the circumstances in this case, is not in [AS's] best interests.

The family court's conclusions of law were as follows:

1. Pursuant to HRS § 587A–15(d)(2), DHS has the authority to determine where and with whom a child in its permanent custody shall live.

2. DHS's determination that a placement for a child in its permanent custody is in the child's best interests is an ultimate finding of fact that is reviewable by the family court under the clearly erroneous standard of review. *In re Doe*, 89 Hawai'i 477, 487 [974 P.2d 1067] (App.1999); *In re Jane Doe*, 7 Haw.App. 547, 556–558 [784 P.2d 873] (1989).

3. The court can only find that DHS has abused its discretion in exercising its au-

Placement of Children Active with Child Welfare Services Branch (CWSB)." It states, in relevant part, that the CWSB's policy is "to seek and assess relatives or kin as foster, adoptive, and/or permanent placement resources for children under the Department's voluntary, court-ordered foster or permanent custody and that relatives or kin placement is preferred to maintain family connections." (Emphasis added). Further, DHS Policy Directive PA No.2005–5 states, "In the absence of safety factors, ... placement with kin meeting CWSB licensing requirements shall be a priority in order to maintain family connections and as a permanent resource for children." (Emphasis in original.)

DHS Policy Directive PA No.2005–7, entitled "Standards for Kin Placement of Children Under the Department of Human Services' (DHS) Placement Responsibility," makes the same statement that "placement with kin meeting CWSB licensing requirements shall be a priority in order to maintain life-long and enduring family connections and as a permanent resource for

children." (Emphasis in original.) In addition, it provides, "In the absence of any statutory definition or guidelines for 'the best interests of the children' in § 587–1, CWSB staff shall apply the ... Safe Family Home Guidelines' (SFHG) factors in § 587–25 when using 'the best interests of the children' in assessing and selecting kin as foster and/or adoptive placement[.]" Further, DHS Policy Directive PA No.2005–7 states, "All child placement decisions are subject to Family Court review. This policy directive does not interfere with the Family Court's discretion to decide what is in the best interests of the children...."

DHS Policy Directive PA No.2005–8 is entitled "Permanent Plan Approval" and states that it is DHS's "policy to seek and assess kin as foster, adoptive, and/or permanent placement for children under the Department's custody and that kin placement shall be a priority to maintain lifelong family connections." (First emphasis added; second emphasis in original.)

thority to determine where and with whom a child in its permanent custody shall live if DHS's ultimate factual finding that a placement for the child is in his/her best interests is clearly erroneous.

4. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the reviewing court is nonetheless left with a definite and firm conviction that a mistake has been made. *In re Doe*, 89 Hawai'i at 487 [974 P.2d 1067].

5. It is in [AS's] best interest to remain in her placement with Foster Parents.

6. It is not in [AS's] best interest to be removed from her placement with the Foster Parents and placed with [Maternal Aunt] on Maui.

7. DHS's ultimate finding of fact that placement of [AS] with [Maternal Aunt] is in her best interests is clearly erroneous, insofar as the court is left with definite and firm conviction that, despite, substantial evidence in support of DHS's finding, a mistake has been made by DHS.

8. DHS has abused its discretion in exercising its authority to determine where and with whom [AS] shall live, because its determination that placement of [AS] with [Maternal Aunt] is in her best interests is clearly erroneous.

9. The court has the authority to direct DHS to maintain [AS's] placement with Foster Parents. *In re Doe*, 101 Hawai'i 220, 230–31 [65 P.3d 167] (2003).

10. Notwithstanding the court's findings and conclusions that DHS has abused its placement discretion in this case, there is not good cause to remove DHS as [AS's] permanent custodian.

11. To the extent that any of the findings of fact set forth above can be construed to be conclusions of law, they are incorporated herein as conclusions of law.

## B. Appeal

DHS timely appealed the family court's Order Re: Trial on Placement. Maternal Aunt did not appeal. Relevant to this Application, DHS raised the following points of error on appeal:

2) As a matter of law, the family court was wrong by failing to follow and apply Hawaii and Federal child protective laws that created family placement preferences to place children in State foster care with their family, if appropriate.... The family court further erred by focusing on DHS' family placement policy preference (that is in accord with Federal and Hawaii law)....

3) As a matter of law, the family court was wrong by creating a contradictory two-step standard of proof, in contravention of existing law, by first requiring DHS to prove that its proposed discretionary placement with Maternal Aunt was in A.S.'s best interest, and if DHS did not meet its burden, then the burden shifted to the parties opposing DHS' discretionary placement recommendation to prove that DHS abused its discretionary placement recommendation.... The correct standard of proof requires the parties opposing DHS's discretionary placement recommendation to prove that DHS abused its discretion, as the [sic] A.S.'s permanent custodian, in determining which placement is in the [sic] A.S.'s best interests.... The family [court] ultimately used a pure "best interests of the child" analysis ... which [was] wrong.

4) As a matter of law, the family court was wrong in failing to consider the passage of time caused by DHS' obligation to give Father the opportunity to reunify on Oahu and its negative impact on the exercise of its placement discretion to place A.S. on Maui....

6) As a matter of law, The Family Court was wrong in denying DHS' request to be discharged as A.S.'s permanent custodian, after ordering DHS not to place AS with her maternal aunt....

DHS requested that the ICA "reverse the family court's placement ruling, and issue orders authorizing DHS to place AS with her maternal aunt or remand to the family court to issue such orders." In the alternative, DHS requested that the ICA "reverse the family court's denial of its request to be

discharged as A.S.'s permanent custodian, and issue orders granting DHS' request or remand to the family court to issue such orders." The Foster Parents and the VGAL, on the other hand, asked the ICA to affirm the decision of the family court.

The ICA affirmed the family court in a published opinion. *In re AS,* 130 Hawai'i 486, 312 P.3d 1193. The ICA summarized the family court's review of DHS's placement decision as follows:

> The family court ultimately applied a two-prong standard of review that involved (1) independently deciding whether DHS's placement decision was in AS's best interest; and (2) if the court found the placement was not in AS's best interest, reviewing DHS's placement decision for an abuse of discretion, which meant deciding whether DHS's "best-interests" determination was clearly erroneous based on a preponderance of the evidence.

*In re AS,* 130 Hawai'i at 503, 312 P.3d at 1210. The ICA noted that the family court based its standard of review determination on *In re Doe,* 7 Haw.App. 547, 557–58, 784 P.2d 873, 880 (1989)("*1989 Doe* "), which noted, "[T]he decision as to what custodial arrangements are in the best interest of a specific child is a matter for the court's discretion," then held that decision "is a matter or question of ultimate fact reviewable under the clearly erroneous standard of review." *In re AS,* 130 Hawai'i at 503, 312 P.3d at 1210, 1212. The ICA then overruled this holding in *1989 Doe* as applied to the family court's review of DHS's determination that a certain placement is in a child's best interests, but it left the holding intact as applied to appellate review of a family court's decision as to which placement is in a child's best interests. *In re AS,* 130 Hawai'i at 506, 312 P.3d at 1213, 1213 n. 18. The ICA concluded that the family court, "based on the evidence presented, must make its own determination regarding whether the placement of the child is in the child's best interest." *In re AS,* 130 Hawai'i at 506, 312 P.3d at 1213.

With regard to DHS's argument that the burden is on the party challenging DHS's permanent placement decision to prove that DHS abused its placement discretion under HRS § 587A–15(d)(2) (Supp.2010)[5], the ICA held that the statute "characterizes DHS's permanent placement authority as a 'duty' and a 'right,' but nowhere suggests that DHS may exercise that authority in its discretion." *In re AS,* 130 Hawai'i at 508, 312 P.3d at 1215 (footnote omitted). The ICA contrasted DHS's placement authority under HRS § 587A–15(d)(2) with other provisions of the CPA that do characterize DHS's decisions as discretionary: HRS §§ 587A–9 (Supp.2010) ("Temporary foster custody without court order"), –15(c)(1) (Supp. 2010) ("Duties, rights, and liability of authorized agencies"), and –26(e)(3) ("Temporary foster custody hearing") (Supp. 2010). *In re AS,* 130 Hawai'i at 508, 312 P.3d at 1215. The ICA then "presume[d] the legislature intentionally declined to vest DHS with discretion to make placement decisions." *In re AS,* 130 Hawai'i at 508, 312 P.3d at 1215 (citation omitted). The ICA concluded that the family court's review of DHS's placement decision for an abuse of discretion was error, but that such error was harmless. *Id.*

The ICA next rejected DHS's argument that state and federal law contain a relative placement preference. *In re AS,* 130 Hawai'i at 509–12, 312 P.3d at 1216–19. The ICA held that HRS §§ 587A–2 (Supp.2010) ("Purpose; construction"), –7 (Supp. 2010) ("Safe family home factors"), –10 (Supp. 2010) ("Relatives; foster placement"), and –26(e)(2) ("Temporary foster custody hearing") do not contain an explicit or mandatory preference in favor of relative placements. *In re AS,* 130 Hawai'i at 511, 312 P.3d at 1218. The ICA noted only HRS § 587A–9, which pertains to temporary foster custody without court order, expressly contains a relative placement preference. *Id.* (citing HRS § 587A–9, which provides, in relevant part, "Unless the child is admitted to a hospital or similar institution, [DHS shall] place the child in emergency foster care while the de-

---

**5.** HRS § 587A–15 is entitled "Duties, rights, and liability of authorized agencies." HRS § 587A–15(d)(2) provides, "If an authorized agency has permanent custody, it has the following duties and rights: ... Determining where and with whom the child shall live; provided that the child shall not be placed outside the State without prior order of the court[.]"

partment conducts an appropriate investigation, with placement preference being given to an approved relative." (emphasis added)).

The ICA also stated that *In re Doe*, 103 Hawai'i 130, 136–37, 80 P.3d 20, 26–27 (App.2003)("*November 2003 Doe*"), already ruled that there is no relative placement preference in the CPA's purpose clause, following 1998 amendments emphasizing the child's safety and best interests over reunification with family. *In re AS*, 130 Hawai'i at 511–12, 312 P.3d at 1218–19. To that end, the ICA rejected DHS's argument that *1989 Doe*, 7 Haw.App. 547, 556, 784 P.2d 873, 879, which stated that "HRS Chapter 587 accords priority to the child's family" remained good law following *November 2003 Doe. In re AS*, 130 Hawai'i at 512, 312 P.3d at 1219. The ICA also observed that "[n]othing in [the current CPA purpose clause] or its legislative history suggests that the emphasis on a child's safety and best interests no longer takes precedence over a preference for family placements." *Id.* Moreover, the ICA noted, "[a]ssuming there was a preference for relative placement, it would not super[s]ede 'best interest' considerations." *In re AS*, 130 Hawai'i at 511, 312 P.3d at 1218 (citations omitted).

As to whether federal law contained a relative placement preference, the ICA concluded, "DHS does not cite to any authority to support the notion that this exercise of Congress's Spending Power required the family court to accept DHS's placement recommendation, and nothing in HRS Chapter 587A or in any case law construing Chapter 587A suggests that it does." *In re AS*, 130 Hawai'i at 512, 312 P.3d at 1219. The ICA did not address the authorities DHS cited in its Opening Brief: Title IV–E of the Social Security Act (42 U.S.C. §§ 670 to 679c (2011)); Section 5 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, P.L. 104–193, 110 Stat. 2105; the Fostering Connections to Success and Increasing Adoptions Act of 2008, P.L. 110–351, 122 Stat. 3949; or 45 C.F.R. § 1355.34 (2012).

As to DHS's argument that the family court failed to consider the passage of time caused by DHS to give Father the opportunity to reunify with AS on Oahu, the ICA held,

"DHS has not shown and we find no evidence that the court failed to consider any of the delays" in AS's placement decision. *In re AS*, 130 Hawai'i at 515, 312 P.3d at 1222.

Lastly, with regard to DHS's argument that the family court should have revoked its permanent custodianship after concluding that the agency abused its discretion in making its placement recommendation, the ICA stated that DHS misused *March 2003 Doe*, 101 Hawai'i at 229, 65 P.3d at 176. *In re AS*, 130 Hawai'i at 517, 312 P.3d at 1224. The ICA stated, "The supreme court never held that where the family court rejects a DHS placement recommendation, the supreme court should revoke DHS's custody." *Id.*

### III. Discussion

#### A. Standard of Proof

We address DHS's second question presented first. On certiorari, DHS's second question presented is

2. Did the ICA commit grave errors of law in ruling that the standard and burden of the family court's review of DHS' permanent placement decision required DHS to prove that its permanent placement decision was in the child's best interest, instead of placing the burden on the person challenging DHS' placement decision to prove that DHS abused its discretion in making its assessment? Was the ICA's ruling also inconsistent with the Supreme Court's ruling in *In re Doe[,]* 101 Hawai'i 220, 231, 65 P.3d 167, 178 (2003)?

DHS continues to argue on certiorari that the family court's standard of review of its placement decisions is based on an abuse of discretion standard. DHS asserts the party challenging DHS's placement decision carries the burden of proving that DHS abused its discretion in determining which placement is in the child's best interests. DHS therefore argues that the ICA failed to follow the doctrine of stare decisis when it overruled *1989 Doe* in part because it failed to provide a compelling justification to overturn the decision.

The ICA correctly overruled *1989 Doe* in part. In that case, the VGAL appealed the family court's decision allowing DHS to re-

move a minor from foster parents, who desired to adopt the minor, to be placed with family members who were planning on adopting the minor's two brothers. 7 Haw. App. at 548, 551–52, 784 P.2d at 875, 877. The ICA first noted that the proper appellate standard for reviewing the family court's child custody decisions was as follows: "[T]he decision as to what custodial arrangements are in the best interests of a specific child is a matter for the court's discretion." 7 Haw.App. at 557, 784 P.2d at 880 (emphasis added). The ICA characterized the best interests decision as "a matter or question of ultimate fact reviewable under the clearly erroneous standard of review." 7 Haw.App. at 558, 784 P.2d at 880. DHS interprets *1989 Doe* as granting it the same kind of "discretion" in placement decisions made in a child's best interests that requires a quasi-appellate finding of "abuse of discretion" to overcome.

The current CPA and *November 2003 Doe,* however, do not require the family court to review DHS's permanent placement decisions in this way. First, HRS § 587A–31(c)(2) (Supp.2010), entitled "Permanency hearing," provides the following (with emphasis added): "At each permanency hearing, the court shall make written findings pertaining to: ... Whether the current placement of the child continues to be appropriate and in the best interests of the child or if another in-state or out-of-state placement should be considered...." This statutory provision requires the family court to make its own independent determination of the child's best interests in a permanent placement.

█ Second, in *November 2003 Doe,* 103 Hawai'i at 134–35, 80 P.3d at 24–25, a mother who had lost her parental rights argued that the family court should not have ordered DHS to keep the subject children in their current foster home because she believed it was in their best interests to be placed with mainland relatives. Similarly to DHS in this case, the mother argued " '[W]hen DHS has permanent custody, it is authorized by HRS § 587–2 "to determine where and with whom the child shall live," ' and, therefore, the family court abused its discretion when it ordered that 'the Children are not to be removed from their current

foster family placements without prior Court approval.' " 103 Hawai'i at 140, 80 P.3d at 30. The ICA in that case disagreed, stating, "[T]he permanent custodian's 'duties and rights of a legal custodian and family member' are subject to the ultimate control of the family court." *Id.* Thus, the similarly worded current statute, HRS § 587A–15(d)(2), which states that DHS, as a permanent custodian, has the "dut[y] and right" to "[d]etermin[e] where and with whom the child shall live," is also "subject to the ultimate control of the family court," which is authorized and required, under HRS § 587A–31(c)(2), to review a permanent plan to determine whether "the current placement of the child continues to be appropriate and in the best interests of the child or if another in-state or out-of-state placement should be considered...." (Emphasis added.) In short, the family court is not required to determine whether DHS abused its discretion in making a placement determination in a child's best interests. Rather, the current CPA and case law authorize and require the family court to make its own best interests determination. Cogent and compelling reasons supported the ICA's decision to overrule *1989 Doe* to the extent that case held otherwise.

█ We clarify the ICA's opinion, however, and extend it to hold that, as in this case, where a party challenges DHS's permanent placement determination, that party bears the burden of proving, by a preponderance of the evidence, that DHS's permanent placement determination is not in the best interests of the child. This is because DHS is charged with administering child welfare services in the state, and its social workers are presumed to be experts on child protection and child welfare. *See* HRS § 326–51 (1993 & Supp.2008); HRS § 587A–19 (Supp.2010). As such, the burden of proof, resting with the party contesting DHS's permanent placement recommendation, is a preponderance of the evidence. *See* HRS § 587A–4 (Supp. 2010) (" 'Preponderance of the evidence' means the degree of proof, which as a whole, convinces the trier of fact that the fact sought to be proved is more probable than not. 'Preponderance of the evidence' shall

be the standard of proof required in any proceeding, unless otherwise specified.")

### B. Placement Discretion

■ On certiorari, DHS's first question presented is

1. In ruling that DHS, as the permanent custodian of a child, did not have the discretion to determine a child's placement, did the ICA commit grave errors of law by:

a) Disregarding (and overturning) the Hawaii Supreme Court's ruling in *In re Doe*, 100 Hawai'i 335, 346 & [n.] 19, 60 P.3d 285, 296 & [n.] 19 (2002) that held when DHS is appointed the permanent custodian of a child, DHS has the discretion to determine the child's permanent placement?

b) Violating the rules of statutory interpretation when it erroneously held that while HRS § 587A–15(d)(2) gave DHS, as a child's permanent custodian, the duty and authority to determine a child's placement, DHS had no discretion because of the absence of the word "discretion?" Does the ICA's holding create absurd results, such as making the Judiciary, instead of DHS, the primary child-placing agency when children are placed in temporary foster, foster and permanent custody, notwithstanding contrary statutory language and legislative intent?

DHS characterizes the ICA's observation (that HRS § 587A–15(d)(2) does not contain the word "discretion") as separate from the ICA's holding that the family court does not review DHS's permanent placement determinations under an abuse of discretion standard. When read in context, however, the ICA's statement arose as part of its discussion about the standard under which DHS's placement determinations are to be reviewed by the family court. *In re AS*, 130 Hawai'i at 508, 312 P.3d at 1215. Therefore, we reject DHS's argument that the ICA's opinion stripped DHS of its discretion, in the first instance, to place children in the agency's foster and permanent custody. In order to exercise its statutory "duty" and "right" to determine "where and with whom the child shall live," pursuant to HRS § 587A–15(d)(2), DHS must necessarily be free as an agency,

with its particular expertise in child welfare, to make choices among living arrangements, subject to an independent best interests review by the family court.

As such, we agree with DHS that *In re Doe*, 100 Hawai'i 335, 346, 346 n. 19, 60 P.3d 285, 296, 296 n. 19 (2002), has already held that DHS has the discretion to make permanent placement decisions. That case noted the following: "[U]pon the termination of parental rights, discretion to determine an appropriate custodian is vested in DHS. . . . After termination of rights, custody is given to DHS which is charged with finding a suitable home for the child." *Id.* (citation omitted). As explained, *supra*, in Section III.A, this placement determination is, however, subject to review by the family court, which is authorized and required by law to determine whether the placement is in the child's best interests.

### C. Relative Placement Preference in State and Federal Law

On certiorari, DHS's third question presented is

3. Did the ICA commit grave errors of law in ruling that Federal and Hawaii law did not create relative/family placement preferences for children in foster care, including those in the permanent custody of DHS?

#### 1. Federal Law

On certiorari, DHS argues, "Congress enacted legislation granting the States money on the condition that they comply with Federal child protection/welfare laws. . . ." We now discuss whether the federal authorities DHS cites (Title IV–E of the Social Security Act (42 U.S.C. §§ 670 to 679c (2011)); Section 5 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, P.L. 104–193, 110 Stat. 2105; the Fostering Connections to Success and Increasing Adoptions Act of 2008, P.L. 110–351, 122 Stat. 3949; or 45 C.F.R. § 1355.34 (2012)) condition the receipt of federal funds upon permanent placement with relatives. We hold they do not.

■ First, DHS argues that one section of Title IV–E, 42 U.S.C. § 671(a)(19) (2011),

which was added via Section 5 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, P.L. 104–193, 110 Stat. 2105, contains the federal relative placement preference. That statute provides that "the state shall consider giving preference to an adult relative over a non-related caregiver when determining a placement for a child, provided that the relative caregiver meets all relevant State child protective standards[.]" The word "consider" indicates that relative placement must factor into a placement decision, but it does not mandate relative placement. Therefore, 42 U.S.C. § 671(a)(19) does not condition the receipt of Title IV–E funds on relative placement.

Second, as relevant to this appeal, the amendments made to Title IV–E by the Fostering Connections to Success and Increasing Adoptions Act of 2008, P.L. 110–351, 122 Stat. 3949, do not condition Title IV–E funds upon relative placement. 42 U.S.C. § 671(a) (2011) states, "In order for a State to be eligible for payments under this part [42 USCS §§ 670 et seq.], it shall have a plan approved by the Secretary...." Features of this "State plan for foster care and adoption assistance" include "a waiver of [certain foster home standards] made only on a case-by-case basis for non-safety standards (as determined by the State) in relative foster family homes for specific children in care...." 42 U.S.C. § 671(a)(10); child abuse and neglect and criminal records checks on any relative guardian before kinship guardian assistance payments are made, 42 U.S.C. § 671(a)(20)(C); "kinship guardianship assistance agreements to provide kinship guardianship assistance payments on behalf of children to grandparents and other relatives who have assumed legal guardianship of the children for whom they have cared as foster parents and for whom they have committed to care on a permanent basis...." 42 U.S.C. § 671(a)(28); and "notice to all adult grandparents and other adults relatives of the child" that the child has been removed from parental custody and explaining options for kinship care. 42 U.S.C. § 671(a)(29). None of these provisions for State plans conditions receipt of federal funds on a relative placement preference.

Further, 42 U.S.C. § 673(d) (2011), as amended by the Fostering Connections to Success and Increasing Adoptions Act of 2008, created kinship guardianship assistance payments for relatives providing foster care. That section makes eligibility for such payments dependent upon the child's attachment to the relative, and the relative's strong commitment towards the child, but does not reflect a relative placement preference.[6] Next, 42 U.S.C. § 675(1)(E) (2011) envisions permanent placements with persons other than relatives, with placement decisions explained

---

**6.** 42 U.S.C. § 673(d) reads in full as follows (with emphasis added):

(d) Kinship guardianship assistance payments for children. (1) Kinship guardianship assistance agreement.
(A) In general. In order to receive payments under section 474(a)(5) [*42 USCS § 674(a)(5)*], a State shall—
(i) negotiate and enter into a written, binding kinship guardianship assistance agreement with the prospective relative guardian of a child who meets the requirements of this paragraph; and
(ii) provide the prospective relative guardian with a copy of the agreement.
(B) Minimum requirements. The agreement shall specify, at a minimum—
(i) the amount of, and manner in which, each kinship guardianship assistance payment will be provided under the agreement, and the manner in which the payment may be adjusted periodically, in consultation with the relative guardian, based on the circumstances of the relative guardian and the needs of the child;

(ii) the additional services and assistance that the child and relative guardian will be eligible for under the agreement;
(iii) the procedure by which the relative guardian may apply for additional services as needed; and
(iv) subject to subparagraph (D), that the State will pay the total cost of nonrecurring expenses associated with obtaining legal guardianship of the child, to the extent the total cost does not exceed $2,000.
(C) Interstate applicability. The agreement shall provide that the agreement shall remain in effect without regard to the State residency of the relative guardian.
(d) No effect on Federal reimbursement. Nothing in subparagraph (B)(iv) shall be construed as affecting the ability of the State to obtain reimbursement from the Federal Government for costs described in that subparagraph.
(2) Limitations on amount of kinship guardianship assistance payment. A kinship guardianship assistance payment on behalf of a child shall not exceed the foster care

in the child's case plan.[7] In the case of a child permanently placed with relatives, 42 U.S.C. § 675(1)(F) (2011) requires a written case plan describing the rationale behind the child's placement as well.[8] None of these federal statutory provisions reflects a relative placement preference. DHS overstates the impact of the Fostering Connections to Success and Increasing Adoptions Act of 2008, which amended each of the foregoing sections.

■ Third, the regulations implementing Title IV–E do not show that Title IV–E

funds are conditioned upon relative placement. It is true that 45 C.F.R. § 1355.34(b)(ii)(B) (2012) provides the following: "(b) Criteria related to outcomes .... (ii) In the area of permanency for children: ... (B) The continuity of family relationships and connections is preserved for children...." This language encourages continuous family relationships but does not mandate relative placement. Moreover, 45 C.F.R. § 1355.25 provides, with emphasis added:

The following principles, most often identified by practitioners and others as helping

maintenance payment which would have been paid on behalf of the child if the child had remained in a foster family home.
(3) Child's eligibility for a kinship guardianship assistance payment.
(A) In general. A child is eligible for a kinship guardianship assistance payment under this subsection if the State agency determines the following:
(i) The child has been—
(I) removed from his or her home pursuant to a voluntary placement agreement or as a result of a judicial determination to the effect that continuation in the home would be contrary to the welfare of the child; and
(II) eligible for foster care maintenance payments under section 472 [42 USCS § 672] while residing for at least 6 consecutive months in the home of the prospective relative guardian.
(ii) Being returned home or adopted are not appropriate permanency options for the child.
(iii) The child demonstrates a strong attachment to the prospective relative guardian and the relative guardian has a strong commitment to caring permanently for the child.
(iv) With respect to a child who has attained 14 years of age, the child has been consulted regarding the kinship guardianship arrangement.
(B) Treatment of siblings. With respect to a child described in subparagraph (A) whose sibling or siblings are not so described—
(i) the child and any sibling of the child may be placed in the same kinship guardianship arrangement, in accordance with section 471(a)(31) [42 USCS § 671(a)(31)], if the State agency and the relative agree on the appropriateness of the arrangement for the siblings; and
(ii) kinship guardianship assistance payments may be paid on behalf of each sibling so placed.

7. 42 U.S.C. § 675(1)(E) reads in full as follows (with emphasis added):
(1) The term "case plan" means a written document which includes at least the following:

... (E) In the case of a child with respect to whom the permanency plan is adoption or placement in another permanent home, documentation of the steps the agency is taking to find an adoptive family or other permanent living arrangement for the child, to place the child with an adoptive family, a fit and willing relative, a legal guardian, or in another planned permanent living arrangement, and to finalize the adoption or legal guardianship. At a minimum, such documentation shall include child specific recruitment efforts such as the use of State, regional, and national adoption exchanges including electronic exchange systems to facilitate orderly and timely in-State and interstate placements.

8. 42 U.S.C. § 675(1)(F) reads in full as follows:
(1) The term "case plan" means a written document which includes at least the following: ... (F) In the case of a child with respect to whom the permanency plan is placement with a relative and receipt of kinship guardianship assistance payments under section 473(d) [42 USCS § 673(d)], a description of—
(i) the steps that the agency has taken to determine that it is not appropriate for the child to be returned home or adopted;
(ii) the reasons for any separation of siblings during placement;
(iii) the reasons why a permanent placement with a fit and willing relative through a kinship guardianship assistance arrangement is in the child's best interests;
(iv) the ways in which the child meets the eligibility requirements for a kinship guardianship assistance payment;
(v) the efforts the agency has made to discuss adoption by the child's relative foster parent as a more permanent alternative to legal guardianship and, in the case of a relative foster parent who has chosen not to pursue adoption, documentation of the reasons therefor; and
(vi) the efforts made by the State agency to discuss with the child's parent or parents the kinship guardianship assistance arrangement, or the reasons why the efforts were not made.

to assure effective services for children, youth, and families, should guide the States ... in developing, operating, and improving the continuum of child and family services. (a) The safety and well-being of children and of all family members is paramount.

Thus, like Hawaii's CPA, Title IV–E of the Social Security Act, along with its implementing regulations, encourages relative placements but considers the child's safety to be an overriding concern.

Lastly, even Title IV–E recognizes the authority of State courts over protected chil-

dren under their jurisdiction. 42 U.S.C. § 678 states, "Nothing in this part [42 USCS §§ 670 et seq.] shall be construed as precluding State courts from exercising their discretion to protect the health and safety of children in individual cases...." In sum, there is no federal relative placement preference that DHS was compelled to carry out under Congress's spending power.

## 2. State Law

We agree with the ICA's conclusion that there is no relative placement preference in HRS §§ 587A–2 [9], –7 [10], 10 [11], and 26(e)(2) [12].

---

9. HRS § 587A–2 provides the following:

**Purpose; construction.** This chapter creates within the jurisdiction of the family court a child protective act to make paramount the safety and health of children who have been harmed or are in life circumstances that threaten harm. Furthermore, this chapter makes provisions for the service, treatment, and permanent plans for these children and their families.

The legislature finds that children deserve and require competent, responsible parenting and safe, secure, loving, and nurturing homes. The legislature finds that children who have been harmed or are threatened with harm are less likely than other children to realize their full educational, vocational, and emotional potential, and become law-abiding, productive, self-sufficient citizens, and are more likely to become involved with the mental health system, the juvenile justice system, or the criminal justice system, as well as become an economic burden on the State. The legislature finds that prompt identification, reporting, investigation, services, treatment, adjudication, and disposition of cases involving children who have been harmed or are threatened with harm are in the children's, their families', and society's best interests because the children are defenseless, exploitable, and vulnerable. The legislature recognizes that many relatives are willing and able to provide a nurturing and safe placement for children who have been harmed or are threatened with harm.

The policy and purpose of this chapter is to provide children with prompt and ample protection from the harms detailed herein, with an opportunity for timely reconciliation with their families if the families can provide safe family homes, and with timely and appropriate service or permanent plans to ensure the safety of the child so they may develop and mature into responsible, self-sufficient, law-abiding citizens. The service plan shall effectuate the child's remaining in the family home, when the family home can be immediately made safe with services, or the child's returning to a safe

family home. The service plan shall be carefully formulated with the family in a timely manner. Every reasonable opportunity should be provided to help the child's legal custodian to succeed in remedying the problems that put the child at substantial risk of being harmed in the family home. Each appropriate resource, public and private, family and friend, should be considered and used to maximize the legal custodian's potential for providing a safe family home for the child. Full and careful consideration shall be given to the religious, cultural, and ethnic values of the child's legal custodian when service plans are being discussed and formulated. Where the court has determined, by clear and convincing evidence, that the child cannot be returned to a safe family home, the child shall be permanently placed in a timely manner.

The policy and purpose of this chapter includes the protection of children who have been harmed or are threatened with harm by:
(1) Providing assistance to families to address the causes for abuse and neglect;
(2) Respecting and using each family's strengths, resources, culture, and customs;
(3) Ensuring that families are meaningfully engaged and children are consulted in an age-appropriate manner in case planning;
(4) Enlisting the early and appropriate participation of family and the family's support networks;
(5) Respecting and encouraging the input and views of caregivers; and
(6) Ensuring a permanent home through timely adoption or other permanent living arrangement, if safe reunification with the family is not possible.

The child protective services under this chapter shall be provided with every reasonable effort to be open, accessible, and communicative to the persons affected by a child protective proceeding without endangering the safety and best interests of the child under this chapter.

This chapter shall be liberally construed to serve the best interests of the children affected and the purpose and policies set forth herein.

■ We agree with the ICA that HRS § 587A–9 expresses a relative preference in emergency, temporary foster care placements. *In re AS*, 130 Hawai'i at 511, 312 P.3d at 1218. That statute provides the following, with emphasis added:

**Temporary foster custody without court order.** (a) When the department receives protective custody of a child from the police, the department shall:

(1) Assume temporary foster custody of the child if, in the discretion of the department, the department determines that the child is subject to imminent harm while in the custody of the child's family;

(2) Make every reasonable effort to inform the child's parents of the actions taken, unless doing so would put another person at risk of harm;

(3) Unless the child is admitted to a hospital or similar institution, place the child in emergency foster care while the department conducts an appropriate investigation, <u>with placement preference being given to an approved relative;</u>

(4) With authorized agencies, make reasonable efforts to identify and notify all relatives within thirty days of assuming temporary foster custody of the child; and

(5) Within three days, excluding Saturdays, Sundays, and holidays:

(A) Relinquish temporary foster custody, return the child to the child's parents, and proceed pursuant to section 587A–11(3), 587A–11(4), or 587A–11(5);

(B) Secure a voluntary placement agreement from the child's parents to place the child in foster care, and proceed pursuant to section 587A–11(5) or 587A–11(7); or

(C) File a petition with the court.

(b) Upon the request of the department and without regard to parental consent, any physician licensed or authorized to practice medicine in the State shall perform an examination to determine the nature and extent of harm or threatened harm to the child under the department's temporary foster custody.

We also note that HRS § 587A–11 reflects a relative preference in emergency, temporary foster care placements. That statute provides the following, with emphasis added:

**Investigation; department powers.** Upon receiving a report that a child is subject to imminent harm, has been harmed, or is subject to threatened harm, the department shall cause such investigation to be made as it deems to be appropriate. In conducting the investigation, the department may:

(1) Enlist the cooperation and assistance of appropriate state and federal law enforcement authorities, who may conduct an investigation and, if an investigation is conducted, shall provide the department with all preliminary findings, including the results of a criminal history record check of an alleged perpetrator of harm or threatened harm to the child;

(2) Interview the child without the presence or prior approval of the child's family

10. Specifically, DHS argues that HRS §§ 587A–7(a)(10) and (11) express a relative placement preference. HRS § 587A–7(a)(10) and (11) direct the family court to consider the following factors when determining whether a child's family is willing and able to provide the child with a safe family home: "Whether there is a support system available to the child's family, including adoptive and hanai relatives, friends, and faith-based or other community networks[,]" and "[a]ttempts to locate and involve extended family, friends, and faith-based or other community networks[,]" respectively.

11. HRS § 587A–10 provides the following:

**Relatives; foster placement.** (a) The department shall provide the child's relative an application to be the child's resource family within

fifteen days of the relative's request to provide foster placement for the child. If the application is submitted and denied, the department shall provide the applicant with the specific reasons for the denial and an explanation of the procedures for an administrative appeal.

(b) The department and authorized agencies shall make reasonable efforts to identify and notify all relatives of the child within thirty days after assuming foster custody of the child.

12. HRS § 587A–26(e)(2) provides the following at a temporary foster custody hearing: "The court may further order that: … The child's family members who are parties provide the department or another authorized agency the names and addresses of other relatives and friends who are potential visitation supervisors or resource families for the child[.]"

and temporarily assume protective custody of the child for the purpose of conducting the interview;

(3) Resolve the matter in an informal fashion that it deems appropriate under the circumstances;

(4) Close the matter if the department finds, after an assessment, that the child is residing with a caregiver who is willing and able to meet the child's needs and provide a safe and appropriate placement for the child;

(5) Immediately enter into a service plan:

(A) To safely maintain the child in the family home; or

(B) To place the child in voluntary foster care pursuant to a written agreement with the child's parent. If the child is placed in voluntary foster care and the family does not successfully complete the service plan within three months after the date on which the department assumed physical custody of the child, the department shall file a petition. The department is not required to file a petition if the parents agree to adoption or legal guardianship of the child and the child's safety is ensured; provided that the adoption or legal guardianship hearing is conducted within six months of the date on which the department assumed physical custody of the child;

(6) Assume temporary foster custody of the child and file a petition with the court within three days, excluding Saturdays, Sundays, and holidays, after the date on which the department assumes temporary foster custody of the child, with placement preference being given to an approved relative; or

(7) File a petition or ensure that a petition is filed by another appropriate authorized agency in court under this chapter.

HRS §§ 587A–9(a)(3) and –11(6) reflect a relative preference in emergency, temporary foster care placements. As such, these provisions of the CPA carry out 42 U.S.C. § 671(a)(19)'s requirement that the States "consider giving preference to an adult relative over a non-related caregiver when determining a placement for a child, provided that the relative caregiver meets all relevant State child protection standards[.]"

 No such relative preference exists, however, with regard to permanent placements like the one at bar. Instead, HRS § 587A–31 (Supp.2010), which governs permanent placement, provides for a best interests review of the child's current placement, and envisions future placement options as within an adoptive home, with a legal guardian, or with the department or an authorized agency, but not expressly with a relative:

**Permanency hearing.** (a) A permanency hearing shall be conducted within twelve months of the child's date of entry into foster care or within thirty days of a judicial determination that the child is an abandoned infant or that aggravated circumstances are present. A permanency hearing shall be conducted at least every twelve months thereafter for as long as the child remains in foster care under the placement responsibility of the department or an authorized agency, or every six months thereafter if the child remains in the permanent custody of the department or an authorized agency.

(b) The court shall review the status of the case to determine whether the child is receiving appropriate services and care, that case plans are being properly implemented, and that activities are directed toward a permanent placement for the child.

(c) At each permanency hearing, the court shall make written findings pertaining to:

(1) The extent to which each party has complied with the service plan and progressed in making the home safe;

(2) Whether the current placement of the child continues to be appropriate and in the best interests of the child or if another in-state or out-of-state placement should be considered;

(3) The court's projected timetable for reunification or, if the current placement is not expected to be permanent, placement in an adoptive home, with a legal guardian, or under the permanent custody of the department or an authorized agency;

(4) Whether the department has made reasonable efforts, in accordance with the safety and well-being of the child, to:

(A) Place siblings who have been removed from the family home with the same resource family, adoptive placement, or legal guardians; and

(B) Provide for frequent visitation or other ongoing interactions with siblings who are not living in the same household;

(5) The appropriate permanency goal for the child, including whether a change in goal is necessary;

(6) Whether the department has made reasonable efforts to finalize the permanency goal in effect for the child and a summary of those efforts;

(7) The date by which the permanency goal for the child is to be achieved;

(8) In the case of a child who has attained sixteen years of age, the services needed to assist the child with the transition from foster care to independent living; and

(9) Consultations with the child in an age-appropriate manner about the proposed plan for permanency or transition from foster care to independent living.

(d) At each permanency hearing, the court shall order:

(1) The child's reunification with a parent or parents;

(2) The child's continued placement in foster care, where:

(A) Reunification is expected to occur within a time frame that is consistent with the developmental needs of the child; and

(B) The safety and health of the child can be adequately safeguarded; or

(3) A permanent plan with a goal of:

(A) Placing the child for adoption and when the department will file a motion to set the matter for the termination of parental rights;

(B) Placing the child for legal guardianship if the department documents and presents to the court a compelling reason why termination of parental rights and adoption are not in the best interests of the child; or

(C) Awarding permanent custody to the department or an authorized agency, if the department documents and presents to the court a compelling reason why adoption and legal guardianship are not in the best interests of the child.

(e) At each permanency hearing where a permanent plan is ordered, the court shall make appropriate orders to ensure timely implementation of the permanent plan and to ensure that the plan is accomplished within a specified period of time.

(f) A permanency hearing may be held concurrently with a periodic review hearing.

(g) If the child has been in foster care under the responsibility of the department for a total of twelve consecutive months or an aggregate of fifteen out of the most recent twenty-two months from the date of entry into foster care, the department shall file a motion to terminate parental rights, unless:

(1) The department has documented in the safe family home factors or other written report submitted to the court a compelling reason why it is not in the best interest of the child to file a motion; or

(2) The department has not provided to the family of the child, consistent with the time period required in the service plan, such services as the department deems necessary for the safe return of the child to the family home.

(h) Nothing in this section shall prevent the department from filing a motion to terminate parental rights if the department determines that the criteria for terminating parental rights are present.

(Emphasis added).

We also expand upon the ICA's opinion to explain how HRS § 587A–2 (the purpose and construction section of the CPA) has changed through time and thus cannot be the current state statutory source of any relative placement preference. As originally codified in 1983, the CPA's purpose clause called for reunification of foster children with their families where possible:

**Purpose; construction.** This chapter creates within the jurisdiction of the family

court a child protective act in order to safeguard, treat, and provide permanent planning for children who have been harmed or threatened with harm.

The legislature finds that children deserve and require competent and responsible parenting and safe and secure homes. The legislature finds that children who have been harmed or threatened with harm are less likely than other children to realize their full educational, vocational, and emotional potential, and become law-abiding, productive, self-sufficient citizens, and are more likely to become involved with the mental health system, the juvenile justice system, or the criminal justice system, as well as become an economic burden on the State. The legislature finds that prompt identification, reporting, investigation, adjudication, treatment, and disposition of cases involving children who are harmed or threatened with harm are in both the children's and society's best interests because such children are defenseless, exploitable, and vulnerable.

The policy and purpose of this chapter is to provide children with prompt and ample protection from the harms detailed herein, with an opportunity for timely reconciliation with their families where practicable, and with timely and permanent planning so they may develop and mature into responsible, self-sufficient, law-abiding citizens. This permanent planning should effectuate placement with a child's own family when possible and should be conducted in an expeditious fashion so that where return to the child's family is not possible as provided in this chapter, such children will be promptly and permanently placed with responsible, competent, substitute parents and families, and their place in such families secured by termination of parental rights, adoption, guardianship, long-term foster custody orders, if no other option is available, by other order of the court, or arrangement as best provides for permanency.

This chapter shall be liberally construed to serve the best interests of the children and the purposes set out in this chapter.

HRS § 587-1 (1985) (emphases added). In *1989 Doe*, the ICA held that HRS Chapter 587 (1985) "accords priority to the child's family...." 7 Haw.App. at 556, 784 P.2d at 879. *In re Doe Children*, 73 Haw. 15, 20-21, 827 P.2d 1144, 1146-47 (1992), also construed HRS § 587-1 (1985) as stating "a clear preference for keeping families together if possible where the difficulties being faced by the families can be resolved," and as having as its stated purpose "an emphasis on maintaining the family unit."

In *November 2003 Doe*, however, we observed that the legislature "substantially amended HRS § 587-1 and the policy of the law" in 1998. 103 Hawai'i at 136, 80 P.3d at 26. The 1998 amendment was based on the following legislative finding:

Recent trends across the country in dealing with [child abuse] have been to provide alternatives to the traditional philosophy of returning the abused child to the natural family, which may not be in the best interests of the child's safety. Providing a child with a safe home should be the ultimate concern, regardless of whether a safe home be the natural family, adoptive family, or foster family.

1998 Haw. Sess. Laws Act 134, § 1 at 504. In line with its new focus on the child's safety, the following language was added to HRS § 587-1, supplanting family reunification as the CPA's goal: "to make paramount the safety and health of children who have been harmed or are in life circumstances that threaten harm." 1998 Haw. Sess. Laws Act 134, § 6 at 506.

DHS argues that 2008 amendments to HRS § 587-1 restored the family placement preference. It is true that the 2008 legislature added the following language to HRS § 587-1: "The legislature recognizes that many relatives are willing and able to provide a nurturing and safe placement for children who have been harmed or are threatened with harm." 2008 Haw. Sess. Laws Act 199, § 3 at 738. It is also true that the legislature amended HRS §§ 587-21 ("Investigation") and -24 ("Temporary foster custody without court order") to authorize DHS to give placement preference to an appropriate relative in emergency, temporary foster care

cases. 2008 Haw. Sess. Laws Act 199, §§ 4–5 at 738–39. *See* HRS § 587–21(b)(3) (2006 & Supp.2008) ("[DHS] shall ... [a]ssume temporary foster custody of the child ... provided that placement preference shall be given to an appropriate relative identified by the department[.]"); HRS § 587–24(c) (2006 & Supp.2008) ("Upon assuming temporary foster custody of a child under this chapter, the department shall place the child in emergency foster care, ... provided that placement preference for emergency foster care shall be given to the appropriate relative identified by the department.").

The legislative history of these changes demonstrates that the legislature envisioned grandparents, hanai parents, or lawe hanai parents as foster placements. *See* S. Stand. Comm. Rep. No. 2146, in 2008 Senate Journal, at 932 ("The purpose of this measure is to establish a grandparent preference for out-of-home placement of children needing child protective services.... [A] preference may be given to other appropriate family members who are identified by the Department of Human Services[.]"); S. Stand. Comm. Rep. No. 2869, in 2008 Senate Journal, at 1232 ("The purpose of this measure is to establish a preference for grandparents or family members, when making out of home placements for children needing child protective services.... This includes seeking out blood relatives such as grandparents, and hanai and lawe hanai parents."); H. Stand. Comm. Rep. No. 1190–08, in 2008 House Journal, at 1450 ("The purpose of this bill is to establish a preference for certain relatives, lawe hanai, or hanai parents for out-of-home placement of children involved in child protective proceedings."); H. Stand. Comm. Rep. No. 1602–08, in 2008 House Journal, at 1594 ("The purpose of this bill is to establish a preference for certain relatives, including hanai relatives, for out-of-home placement of children involved in child protective proceedings.") As the bill progressed through the Senate to House committees, however, one concern about relative placement emerged:

> Your Committee understands that temporary placement of a child with a relative or other person who is familiar with the child's family and circumstances may be better for the child than placement in foster care with persons unfamiliar to the child. However, there are concerns that while foster parents are licensed and have undergone extensive prescreening, relatives and other persons close to the child may need to undergo a similar level of in-depth screening prior to receiving placement.

*Id.* at 1595. It is perhaps for this reason that the relative placement preference was codified in 2008 to apply only to emergency, temporary foster care placements. To the extent HRS § 587–1, as amended in 2008, reflected a relative placement preference, it must be read in the context of the CPA as a whole to confine such preference to emergency, temporary foster care placements. *See Ko'olau Agric. Co., Ltd. v. Comm'n of Water Res. Mgmt.*, 83 Hawai'i 484, 488, 927 P.2d 1367, 1371 (1996) ("[W]e must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.") (citation omitted).

When Chapter 587 was repealed and the CPA was overhauled in 2010, the purpose section (re-codified as HRS § 587A–2) remained substantially similar[13] to HRS § 587–1, as amended in 2008. *See* 2010 Haw. Sess. Laws Act 135, §§ 1, 8 at 283, 314. The emergency, temporary foster care relative placement preference was also retained in

---

**13.** The major change to the purpose clause consisted of the addition of the following language:
The policy and purpose of this chapter includes the protection of children who have been harmed or are threatened with harm by:
(1) Providing assistance to families to address the causes for abuse and neglect;
(2) Respecting and using each family's strengths, resources, culture, and customs;
(3) Ensuring that families are meaningfully engaged and children are consulted in an age-appropriate manner in case planning;
(4) Enlisting the early and appropriate participation of family and the family's support networks;
(5) Respecting and encouraging the input and views of caregivers; and
(6) Ensuring a permanent home through timely adoption or other permanent living arrangement, if safe reunification with the family is not possible.
2010 Haw. Sess. Laws Act 135, § 1 at 282–83.

newly codified, renumbered sub-sections HRS §§ 587A–9 and –11, as quoted in full, *supra.* As explained, *supra,* however, there is no relative preference in permanent placement cases under the current CPA.

■ There being no state statutory relative preference in permanent placement cases, we disapprove of DHS's Policy Directives PA Nos. 2005–5, –7, and –8, which directed the CWSB to give preference to relatives in determining a foster child's <u>permanent</u> placement, to the extent that those policies imply that DHS may do so without regard to the child's best interests, which are always paramount. As the legislature has recognized, there are possible advantages to the placement of a child with relatives or with others who are familiar with the child's family and circumstances. But to the extent the policy directives suggest to DHS social workers that a relative placement priority takes precedence over other significant factors bearing on a child's best interests, such as a child's attachment to a long-term primary caregiver, as in this case, such directives impermissibly alter the provisions of the Child Protective Act. We discuss the policy directives in greater detail next.

DHS Policy Directive PA No.2005–5, entitled "Supporting, Strengthening, and Maintaining Family Connections through Kinship Placement of Children Active with Child Welfare Services Branch (CWSB)," provides the following:

> This policy directive affirms CWSB's policy to seek and assess relatives or kin as foster, adoptive, and/or <u>permanent placement</u> resources for children under the Department's voluntary, court-ordered foster or permanent custody <u>and that relatives or kin placement is preferred to maintain family connections.</u> ... In the absence of safety factors, ... placement with kin meeting CWSB licensing requirements <u>shall be a priority</u> in order to maintain family connections and <u>as a permanent resource for children.</u>

(First, second, and fourth emphases added; third emphasis in original.) DHS Policy Directive PA No.2005–7, entitled "Standards for Kin Placement of Children Under the Department of Human Services' (DHS)

Placement Responsibility," makes the same statement that "placement with kin meeting CWSB licensing requirements <u>shall be a priority</u> in order to maintain life-long and enduring family connections and as a permanent resource for children." (Emphasis in original.) DHS Policy Directive PA No.2005–8, entitled "Permanent Plan Approval," states that it is DHS's "policy to seek and assess kin as foster, adoptive, and/or <u>permanent placement</u> for children under the Department's custody and that kin placement <u>shall be a priority</u> to maintain lifelong family connections." (First emphasis added; second emphasis in original.)

Nothing in Chapter 587A reflects a relative preference in permanent placement cases. In spite of clear statutory language, DHS's Policy Directives PA Nos. 2005–5, –7, and –8 state that relative placement "shall be a priority" in temporary foster, foster, <u>and permanent placement</u> cases. Chapter 587A and its legislative history indicate that a relative placement preference applies only to emergency, temporary foster care cases. *See* HRS §§ 587A–9 and –11. Hence, DHS's policy directives impermissibly alter the provisions of the Child Protective Act. *See In re Doe,* 73 Haw. at 19, 827 P.2d at 1146 (opining that "the authority of the DHS ... is 'limited to enacting rules which carry out and further the purposes of the legislation and to not enlarge, alter, or restrict the provisions of the act being administered.'") (citing *Puana v. Sunn,* 69 Haw. 187, 189, 737 P.2d 867, 870 (1987)). Limited in this way, DHS was authorized to direct CWSB to give relatives placement preference only in emergency, temporary foster care cases. As such, we hereby disapprove of DHS's Policy Directives PA Nos. 2005–5, –7, and –8, to the extent a relative preference is mandated in permanent placement cases, as beyond DHS's authority to implement under Chapter 587A.

## D. Revocation of DHS's Permanent Custodianship

■ On certiorari, DHS's fourth question presented is

4. Did the ICA commit grave errors of law by ruling that the family court was not

required to remove DHS as the child's permanent custodian after ruling that DHS abused its placement discretion?

The ICA did not err in holding that DHS misused *March 2003 Doe*, 101 Hawai'i at 229, 65 P.3d at 176 to support its argument that the family court should have revoked DHS's permanent custodianship once it had determined that DHS abused its discretion in recommending A.S. be placed with Maternal Aunt. *In re AS*, 130 Hawai'i at 516–17, 312 P.3d at 1223–24. *March 2003 Doe* did not hold that DHS's permanent custodianship should be revoked. In that case, the family court ordered DHS to maintain a concerned child's placement with her aunt in an unlicensed foster home, against DHS's foster placement determination. 101 Hawai'i at 228, 65 P.3d at 175.

DHS argued on appeal that the family court "cannot award foster custody to an authorized agency and simultaneously restrict that agency's statutory placement authority as a foster custodian." *Id.* It argued, "(1) that HRS § 587-2 (1993) expressly vests in a foster custodian the duty and right to determine where and with whom a foster child shall be placed in foster care and, therefore, (2) that where the family court usurps the authorized agency's right to place a foster child under its care, the authorized agency cannot be the foster custodian as a matter of law." *Id.* In other words, DHS argued that because "(1) DHS could not license Aunt's home as a foster family boarding home and (2) the family court concluded ... that it was in [the child's] best interests to remain in the care of Aunt, the family court should have revoked its award of foster custody to DHS and vested foster custody in Aunt." 101 Hawai'i at 229, 65 P.3d at 176. This court stated, "[W]e ... agree with DHS." *Id.*

DHS argues that this court's statement, "We agree," signaled this court's agreement with DHS's request to have its foster custodianship revoked; however, the rest of the opinion makes no such statement. Rather, the focus of the rest of the opinion was on whether the family court had the discretion to override DHS's non-licensure of the aunt

to order placement of the child with the aunt. 101 Hawai'i at 229–31, 65 P.3d at 176–78.

This court noted that the family court abused its discretion in ordering placement with the aunt, who was not licensed, thereby forcing DHS to "violate its own rules and regulations." 101 Hawai'i at 231, 65 P.3d at 178. However, this court further noted that DHS could have licensed the aunt's foster home because denial of a foster care license based on the aunt's background was merely discretionary. 101 Hawai'i at 230, 65 P.3d at 177. It consequently remanded the case to the family court to order it to direct DHS to exercise its discretionary licensing power to license (or not license) the aunt as a foster care provider. 101 Hawai'i at 231, 65 P.3d at 178. If DHS licensed the aunt upon remand, this court noted that the family court may order DHS to place the concerned child with her aunt. *Id.* If DHS did not license the aunt upon remand, this court noted that the family court could override that decision and order licensing, or it could place the concerned child in another licensed foster boarding home. *Id.* The revocation argument was not addressed because of the remand. Therefore, *March 2003 Doe* does not stand for, and we hereby reject, the proposition that once the family court has disagreed with DHS's placement decision, DHS must be relieved of its custodianship over the concerned child.

## IV. Conclusion

We hold that (1) the party challenging DHS's permanent placement recommendation bears the burden of proving by a preponderance of the evidence that the permanent placement is not in the child's best interests; (2) as an agency with child welfare expertise, DHS as permanent custodian of a child, has the discretion in the first instance to determine where and with whom a child shall live; (3) any relative placement preference found in Title IV–E of the Social Security Act does not condition the receipt of federal funds thereunder upon permanent placement of foster children with relatives; (4) there is no relative preference in Chapter 587A with regard to permanent placement of foster children; therefore, to the extent that

DHS's Policy Directives PA Nos. 2005–5, –7, and –8 mandate such a preference, those policies impermissibly alter the CPA and its legislative history; and (5) *In re Doe,* 101 Hawai'i 220, 65 P.3d 167 (2003) does not stand for the proposition that the family court must relieve DHS of its permanent custodianship if the family court disagrees with DHS's permanent placement decision. The ICA's judgment on appeal is affirmed, as clarified by this opinion.

Concurring Opinion by ACOBA, J., in Which POLLACK, J., Joins.

The purpose of HRS Chapter 587A is set forth in Hawai'i Revised Statutes (HRS) § 587A–1, and includes the following statements:

"The legislature recognizes that many relatives are willing and able to provide a nurturing and safe placement for children who have been harmed or threatened with harm.... Each appropriate resources, public and private, family and friend, should be considered and used to maximize the legal custodian's potential for providing a safe family home for the child. Full and careful consideration shall be given to the religious, cultural, and ethnic values of the child's legal custodian when service plans are being discussed and formulated.... This chapter shall be liberally construed to serve the best interest of the children affected and the purpose and policies set forth herein."

The purpose of HRS § 587A–1 plainly incorporates the central role of relatives,[1] who often may also occupy the role of legal guardian.

Under the present Child Protective Act, DHS can assume custody of a child either (1) when the police take custody of a child due to a threat of imminent harm, HRS § 587A–9(1), or (2) by receiving a report that a child is subject to harm and conducting an investigation, HRS § 587A–11, and subsequently filing a petition with the court. HRS §§ 587A–9(5)(C); 587A–11 § 571A–11(7).

When the DHS assumes immediate custody under either section, <u>preference is given to place the child in an emergency placement</u> with "an approved relative." HRS §§ 587A–9(3), 587A–11(6) (emphasis added).

Once the DHS assumes foster custody, HRS § 587A–10 provides that it <u>"shall make reasonable efforts to identify and notify all relatives</u> of the child within thirty days." HRS § 587A–10 (emphasis added). Further, DHS must <u>"provide the child's relative an application to be the child's resource family</u> [i.e., foster parent,] within fifteen days of the relative's request," (emphasis added), and, if the application is denied, DHS "shall provide the applicant with the specific reasons for the denial and an explanation of the procedures for an administrative appeal." *Id.*

Accordingly, the statutes indicate that kinship is often determinative in an emergency and in foster parent placements before the permanency decision. *See* HRS § 587A–11(6) and HRS § 587A–10. Therefore, under the statutory framework, if a child is placed with a relative at the inception of intervention by DHS, custody of the child may likely be with kin through parental termination proceedings, and potentially thereafter as well.

Within 12 months of the child's entry into foster care, the court must conduct a permanency hearing. At a permanency hearing, the court must make findings as to "[w]hether the current placement of the child continues to be appropriate and in the best interests of the child or if another ... placement should be considered." HRS § 587A–31(c)(2).

Thus, assuming the preference for relatives is established in the emergency and subsequent foster parent stages, such preference will be maintained if "the current placement of the child continues to be appropriate and in the best interest of the child."

The court must order either (1) reunification (with the birth parent), HRS § 587A–31(d)(1), (2) the child's continuing placement

---

1. "Relative" is defined as: "a person related to the child by blood or adoption, or a hanai relative as defined in this chapter, who, as determined by the court or the [Department of Human Services (DHS)], is willing and able to safely provide support to the child and the child's family." HRS § 587A–4.

in foster care, if "reunification is expected to occur within a time frame that is consistent with the developmental needs of the child", HRS § 587A–31(d)(2)(A); or (3) a permanent plan. HRS § 587A–31(d)(3).

Once the child has been in foster care for either 12 consecutive months or 15 out of the most recent 22 months, and presumably a permanent plan has been filed, DHS must file a motion to terminate parental rights, unless, *inter alia*, such a motion is not in the best interest of the child. HRS § 587A31(g)(1). At the termination hearing, the permanent plan will be adopted if, (1) the child's parents cannot provide a safe family home, (2) the child's parents will not be able to provide a safe family home within two years of the child's entry into foster care, (3) the proposed permanent plan is in the best interests of the child, and (4) the child consents to the proposed permanent plan if the child is fourteen or older. HRS § 587A–33(a).

The permanent plan then must explain that the permanency goal is either adoption, legal guardianship, or permanent custody, and if the goal is not adoption, present a compelling reason why the alternate goal is in the child's best interests. HRS § 587A–32. The permanent plan may establish "other related goals, include those pertaining to the stability of the child's placement; education; health; therapy; counseling; <u>relationship with the child's birth family, including visits, if any; cultural connections;</u> and preparation for independent living." HRS § 587A–32(4) (emphasis added).

While widely employed, "the best interests of the child" test invites subjective judgments and factors in the evaluation of what is in the best interest of the child.[2] Kinship, as exemplified in the statutes, is an anchoring proposition in the sea of circumstances considered in the decision as to adoption, legal guardianship or permanent custody. DHS and the family court are vested with considerable discretion. In that regard, the statutes do not preclude weighing kinship as a substantial factor in considering with whom a child should be placed under a permanent plan. *See* HRS § 587A–32.

---

**2.** There is no definition of "best interests of the child" in HRS Chapter 587A.