**NOT FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

**Electronically Filed
Intermediate Court of Appeals
CAAP-20-0000715
30-AUG-2021
07:55 AM
Dkt. 88 SO**

NO. CAAP-20-0000715

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


IN THE INTEREST OF KJ-I AKA KKJ-I
AND KJ-I AKA KMKJ-I


APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 17-00274)


SUMMARY DISPOSITION ORDER
(By: Ginoza, Chief Judge, Hiraoka and Nakasone, JJ.)


Respondent-Appellant Mother (**Mother**) appeals and Respondent-Cross-Appellant Father (**Father**) cross-appeals from the Order Terminating Parental Rights (**Termination Order**), entered November 9, 2020, in the Family Court of the First Circuit (**Family Court**),[1] which terminated each of their parental rights to KJ-I aka KKJ-I (**Son**) and KJ-I aka KMKJ-I (**Daughter**) (together, **Children**).

On appeal, Mother and Father (together, **Parents**) challenge various Findings of Fact (**FOFs**) and Conclusions of Law (**COLs**) and contend the Family Court erred in concluding that they were not presently willing and able to provide a safe family home for the Children even with the assistance of a service plan, nor would they be in the reasonable foreseeable future, because Petitioner-Appellee State of Hawaiʻi Department of Human Services

---

[1] The Honorable John C. Bryant, Jr. presided.

(**DHS**) failed to provide reasonable efforts to reunify them with the Children.[2]  Father additionally contends the Family Court erred in finding that the April 21, 2020 Permanent Plan (**Permanent Plan**) was in the Children's best interests as it was out-of-date, contained errors, and had the goal of adoption by the Children's ex-maternal aunt by marriage (**Aunt**) rather than the maternal blood uncle (**Uncle**), despite that they had divorced by the time of trial and despite Parents' preference for Uncle to adopt the Children.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Mother's and Father's points of error as follows, and affirm.

The pertinent background is as follows.  On November 25, 2017, the DHS assumed protective custody of newborn Daughter and one-year-old Son and placed them with Uncle and Aunt, who had just taken Son into their home at the time, per Mother's request. The DHS became involved after receiving a November 24, 2017 report of alleged threat of abuse and neglect of Daughter by Mother, when Mother tested positive for amphetamines when Daughter was born on November 22, 2017.  Uncle and Aunt reported that Mother had called them on November 23, 2017, and asked them to pick up Son from Father's house out of concern that Child Protective Services might take Son.  When Aunt and Uncle picked up Son, they observed that:  his bottom had a "sore . . . that was oozing," as well as scars and "what appeared to be bite marks"; he did not yet walk; he screamed when given a bath; and

---

[2]  "DHS is under an obligation to provide a reasonable opportunity to parents through a service plan to reunify the family" and "to make reasonable efforts to reunite parent and child."  In re Doe, 100 Hawaiʻi 335, 343, 60 P.3d 285, 293 (2002).

he had nightmares.  Uncle reported that Mother had been using methamphetamine for more than 15 years.

On November 29, 2017, the DHS filed a Petition for Temporary Foster Custody (**Petition**) alleging harm by Parents to the Children.  The Family Court conducted a temporary foster custody hearing on the Petition on December 1, 2017, where Parents stipulated to the Petition, foster custody and the service plan.  The Family Court awarded foster custody to the DHS, establishing the Children's date of entry into foster care as December 1, 2017.

The April 30, 2018 Safe Family Home Report indicated that:  Parents had participated in supervised visits with the Children at Aunt and Uncle's home; Parents failed to show up for drug screening; the lab was unable to contact Mother to start screening despite several attempts; and Father tested positive for methamphetamines.  The Guardian Ad Litem (**GAL**) reported that Parents did not consistently visit the Children, and Aunt and Uncle had difficulty contacting them.

At a May 14, 2018 review hearing, the Family Court defaulted Parents for failure to appear.

The September 21, 2018 Safe Family Home Report indicated that Mother and Father admitted to using illicit substances; Mother was scheduled to enter residential treatment in October 2018, but Father had not been in contact with DHS since July 2018.  Mother failed to show up to her psychological evaluation, but Father showed up for his.  The GAL reported that Mother was making efforts to reunify, but Father was not making any meaningful attempt; and the Children were very bonded with Aunt and Uncle.

At the October 2, 2018 review hearing, the Family Court set aside Parents' default since both Mother and Father appeared. The court ordered Parents to follow the latest service plan.

The February 25, 2019 Safe Family Home Report indicated that:  Mother left drug treatment; Parents had not completed any

services on the recommended service plan; and Parents had no contact with the DHS since the October 2018 hearing. The DHS had located Mother at her address, which was boarded up and did not appear to be a safe place, but Mother was not interested in talking; Mother promised to come to the DHS office later to discuss the case but did not do so. The DHS tried to visit Father at his home but could not get past the locked gate. The March 13, 2019 GAL report noted that Parents visited the Children only twice the previous month; recommended termination of parental rights; and adoption by Aunt and Uncle.

At the March 20, 2019 review hearing, the DHS indicated it planned to move to terminate parental rights. Mother's counsel requested that the DHS continue to offer Mother services, and the Family Court responded that the DHS should continue making reasonable efforts at reunification and to offer services.

The July 16, 2019 Safe Family Home Report indicated that both Mother and Father had continually been referred to substance abuse assessments in 2019 and did not follow through, but both Parents had completed their psychological evaluation. The DHS referred Parents for therapy and parenting education on June 21, 2019. The July 29, 2019 GAL report indicated that: the Children were thriving with Aunt and Uncle; Parents did not maintain regular contact with the DHS; Parents had irregular visits with the Children; and Parents had not followed through with services aside from completing their psychological evaluation. The GAL recommended terminating parental rights and awarding adoption to Aunt and Uncle.

At the August 5, 2019 review hearing, Mother's counsel stated the DHS should continue the reasonable efforts to offer services. The Family Court cautioned Parents that the next court date would fall over two years past the December 1, 2017 date of the Children's entry into foster care, and that "nothing" had been done "aside from the psychological evaluation" and that "it's now or never" for Parents to comply.

The December 2, 2019 Safe Family Home Report indicated that while Mother participated in a therapy assessment and one therapy session, she thereafter failed to respond to the counseling center's attempts to contact her; Father did not show for his therapy assessment and failed to respond to attempts to contact him for therapy and for parenting classes. The Initial Permanent Plan had a goal of adoption within six months and stated that Aunt and Uncle wanted to adopt the Children. The December 17, 2019 GAL report noted that Parents had not demonstrated they were willing and able to provide a safe family home; Parents had made minimal progress with their service plan; and that termination of parental rights would be in the Children's best interest with awarding adoption to Aunt and Uncle.

In December 2019, Aunt, the Children, and Aunt's own children moved to a new apartment, as Aunt and Uncle had separated in November 2019. On December 20, 2019, the DHS filed a Motion to Terminate Parental Rights (**Motion to Terminate**).

The April 21, 2020 Permanent Plan indicated a permanency goal of adoption within six months, and noted that Aunt and Uncle were going through a divorce; the Children had remained with Aunt but Uncle wanted the Children to move with him; Uncle's living situation and finances were unstable; Uncle had no driver's license to take the Children to their appointments; and Uncle could not get a driver's license because of unpaid child support. The DHS determined that the Children should continue to live with Aunt who wanted to adopt them.

The final April 21, 2020 Safe Family Home Report indicated that Parents' non-compliance with court-ordered services was continuing and that the DHS felt Parents were not now or in the foreseeable future able to provide a safe family home for the Children even with the assistance of a service plan, and recommended termination of parental rights.

The trial on the Motion to Terminate was held on October 15, 2020. The DHS Social Worker and Father testified, and Mother did not.

On October 22, 2020, the Family Court orally granted the Motion to Terminate, noting that neither parent had completed the ordered services, and finding that DHS had shown, by clear and convincing evidence that: Parents "are not able or willing to presently provide the [C]hildren with a safe family home even with the assistance of a service plan," that "it is not reasonably foreseeable that they will become willing and able to do so," and that the Children had been in foster custody for over 34 months. Regarding the Permanent Plan, the Family Court noted that: the Children had lived exclusively with Aunt since she and Uncle separated in November 2019; neither Parent had moved to consider placement of the Children with Uncle; the Children were "doing well" with Aunt; and "it is too late and not in the [C]hildren's best interest to find that the proposed adoptive placement" should be changed from Aunt to Uncle; therefore, the DHS had shown by clear and convincing evidence that the Permanent Plan was in the Children's best interest.

On November 9, 2020, the Family Court entered the order terminating Parents' parental rights, ordered the Permanent Plan, and awarded permanent custody to the DHS. On December 18, 2020, the Family Court entered its FOFs and COLs. This appeal followed.

Hawaii Revised Statutes (**HRS**) § 587A-33(a) (2018) governs the termination of parental rights and provides in relevant part, as follows:

> (a) At a termination of parental rights hearing, the court shall determine whether there exists clear and convincing evidence that:
>
> (1) A child's parent whose rights are subject to termination is not presently willing and able to provide the parent's child with a safe family home, even with the assistance of a service plan;

6

> 2) It is not reasonably foreseeable that the child's parent whose rights are subject to termination will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, which shall not exceed two years from the child's date of entry into foster care; [and]
>
> (3) The proposed permanent plan is in the best interests of the child.

"Generally, the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion." In re Doe, 95 Hawaiʻi 183, 189, 20 P.3d 616, 622 (2001) (internal quotation marks and citations omitted).

> The family court's determinations . . . with respect to (1) whether a child's parent is willing and able to provide a safe family home for the child and (2) whether it is reasonably foreseeable that a child's parent will become willing and able to provide a safe family home within a reasonable period of time present mixed questions of law and fact; thus, inasmuch as the family court's determinations in this regard are dependant upon the facts and circumstances of each case, they are reviewed on appeal under the clearly erroneous standard. Likewise, the family court's determination of what is or is not in a child's best interests is reviewed on appeal for clear error.
>
> Moreover, the family court is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in this regard, if supported by the record and not clearly erroneous, must stand on appeal.

Id. at 190, 20 P.3d at 623 (citations, quotation marks, and brackets omitted).

> The family court's FOFs are reviewed on appeal under the clearly erroneous standard. A FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

On the other hand, the family court's COLs are reviewed on appeal *de novo*, under the right/wrong standard. COLs, consequently, are not binding upon an appellate court and are freely reviewable for their correctness.

Id. (citations, brackets, quotation marks, and ellipsis omitted). "It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." Id. (citations, brackets, and internal quotation marks omitted). Unchallenged findings of fact are binding on appeal. In re Doe, 99 Hawaiʻi 522, 538, 57 P.3d 447, 463 (2002).

### **Mother**

In support of her argument that the DHS failed to provide reasonable efforts to reunify her with the Children, Mother contends that: (1) at the March 20 and August 5, 2019 review hearings, she requested that the DHS continue to offer her services, but at trial, the DHS Social Worker could not explain why the last contact with Mother listed in the Final Safety Report was made in April 2019; and (2) Mother's psychological evaluation recommended a "dual-diagnosis service" addressing her substance abuse and mental health at the same time, but the DHS Social Worker "admitted" at trial that she did not know whether the treatment services she referred to Mother were dual-diagnosis providers, and she further testified that she relied on Mother to "find her own treatment provider."

Mother's first argument misstates the record. The DHS Social Worker's last attempt to contact Mother noted in the April 21, 2020 Final Safe Home Report, was made on November 8, 2019, not in April 2019. The report indicated that the Social Worker made thirteen attempts to either contact Mother or make service referrals for her after the March 20, 2019 hearing, and four more attempts after the August 5, 2019 hearing. Thus, the record does not indicate that the DHS failed to make service referrals for

Mother after she made requests for continued services, and Mother's contention is without merit.

Mother's second argument is also without merit, because it rests on a factual premise that does not exist in the record. Mother's psychological evaluation never used the term "dual-diagnosis," nor did the evaluation indicate that Mother was "diagnosed" with any form of mental illness. Thus, Mother was not recommended to complete treatment for "dual-diagnosis," but rather recommended to receive treatment that addresses both substance abuse and trauma. In her trial testimony, the DHS Social Worker explained that she did not agree the psychological evaluation necessarily recommended a "dual-diagnosis" treatment, but rather, that Mother "could go into a treatment facility and get therapy." The DHS Social Worker recommended Mother for both drug treatment and therapy.

Accordingly, the Family Court did not clearly err in finding that Mother was not presently willing and able to provide a safe family home even with the assistance of a service plan, nor would she be in the reasonably foreseeable future.[3] In re Doe, 95 Hawaiʻi at 190, 20 P.3d at 623.

**Father**

Father raises specific arguments challenging several FOFs and COLs,[4] and contends that they concern "three overarching errors," i.e., that the Family Court erroneously found that: (1) the Permanent Plan was in the Children's best interest despite that it was out-of-date and contained many errors; (2) the DHS's "6 month break from actively engaging in reunification efforts" constituted "reasonable efforts;" and (3) that terminating

---

[3] We decline to address the individual FOFs and COLs Mother challenges as she fails to present argument on each. See Hawaiʻi Rules of Appellate Procedure (**HRAP**) Rule 28(b)(7) ("Points not argued may be deemed waived.").

[4] Father specifically challenges FOFs 9, 28, 41, 46, 47, 51-53, 56-60, 62, 63, and COLs 3, 10-13.

parental rights with a proposed adoption by Aunt, rather than granting time to explore possible adoption by Uncle, was in the Children's best interests.

### Permanent Plan challenges

We address Father's first and third arguments together, as both contend the Permanent Plan was not in the Children's best interest. Specifically, Father first contends that the Permanent Plan: had not been updated since April 21, 2020, and it indicated that the Children would "maintain relative placement" despite the proposed permanent placement changing from a relative by marriage to a non-relative, as a result of Aunt and Uncle's divorce; it did not acknowledge the bond between the Children and Uncle, despite Uncle and Parents collectively expressing their desire for Uncle to be the adoptive parent; it failed to acknowledge that the family dynamic changed as a result of the divorce because the Children moved into a new apartment with Aunt and Uncle was no longer in the home; and it contained other outdated information and was not fully revised to indicate that it was a final, rather than initial, permanent plan. Father also argues that he had a right to consent to adoption, and that the Permanent Plan's outdated information shows that the DHS ignored Father's requests to pursue adoption by Uncle and instead only sought termination of his parental rights. Father finally contends that terminating parental rights with a proposed adoption by Aunt rather than granting time to explore possible adoption by Uncle, was not in the Children's best interests, specifically, because Parents have the statutory right to consent to adoption, and the option of adoption by Uncle "must be fully explored by DHS and included in a proposed permanent plan."

Related to these contentions, Father challenges FOF 28,[5] COLs 12 and 13.[6]

To grant a motion to terminate parental rights, the Family Court must find, *inter alia*, that "there exists clear and convincing evidence" that the proposed permanent plan is in the Children's best interest. HRS § 587A-33(a)(3). The subsection further provides:

> In reaching this determination, the court shall:
>
> (A) Presume that it is in the best interests of the child to be promptly and permanently placed with responsible and competent substitute parents and family in a safe and secure home; and
>
> (B) Give greater weight to the presumption that the permanent plan is in the child's best interest, the younger the child is upon the child's date of entry into foster care . . . .

Id. (Emphases added).

FOF 28 was not clearly erroneous in its finding that the Children remained in the same "special licensed foster home"

---

[5]     FOF 28 provides:

> 28. Since November 25, 2017, the Children have been in the same special licensed foster home, with a resource caregiver who is committed to being a permanent placement for the Child. The Children's maternal uncle had resided in the special licensed foster home at the inception of this case and had previously been a special licensed resource care giver for the Children. However, the Children's maternal uncle and the current resource caregiver were divorced on August 4, 2020, and the material needs [sic] is no longer a special licensed resource care giver. Based upon the length of time the Children have been in Foster Custody, and based upon the bond that the [C]hildren have with the current resource care giver, it is not in the best interests of the [C]hildren to continue this case any further to explore placement options with [C]hildren's maternal uncle.

(Emphases added).

[6]     COLs 12 and 13 provide:

> 12. Having made Conclusions of Law pertaining to "parental unfitness" pursuant to HRS § 587A-33(a)(1) and (2), the Court makes the following Conclusion of Law regarding the proposed Permanent Plan pursuant to HRS §§ 587A-33(a)(3).
>
> 13. The Permanent Plan dated April 21, 2020, is in the best interests of the Children.

11

with Aunt, who was the "current resource caregiver" at the time of trial. This fact is supported by the GAL's July 6, 2020 report, which indicates that Aunt, the Children, and Aunt's own children moved to a new apartment in December 2019, and Uncle moved to Makaha. The April 21, 2020 Permanent Plan and the April 21, 2020 Safe Family Home Plan indicate that the assessment of the "[s]afety of Child's placement completed 2/19/20 and no safety concerns are indicated," thus reflecting that the DHS found Aunt's home to be safe for the children. During trial, the DSH Social Worker testified that the Children lived in this home and that Uncle moved out of the apartment in January or February of 2020. FOF 28 noted the pending divorce, the fact that Uncle had moved out of the home, that Uncle was no longer a licensed caregiver, and Aunt was the current caregiver. Though FOF 28 contained the following typographical error: "the <u>material needs</u> is no longer a special licensed resource care giver," it appears from the context that it was supposed to state that "maternal uncle" is no longer a special licensed resource caregiver. (Emphasis added). We reject Father's challenge to this typographical error as it does not affect Father's substantial rights. <u>See</u> Hawaiʻi Family Court Rules (**HFCR**) Rule 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties."). FOF 28 was supported by substantial evidence and was not clearly erroneous.

Father challenges COLs 12 and 13 because the Permanent Plan contained multiple errors and omissions, had not been updated for over six months, and had the goal of adoption by a "Maternal Aunt" when Aunt was no longer related due to the divorce. The record shows, however, that the Permanent Plan expressly contemplated Aunt and Uncle's pending divorce, the fact that Uncle had moved out of the home, and the possibility of adoption by Uncle; specifically, it noted:

12

> Resource Caregivers [Aunt and Uncle] are currently going through a divorce. The [C]hildren have remained in the Honolulu area with [Aunt] while [Uncle] has moved to the Waianae area. [Uncle] has expressed his desire to have the [C]hildren move with him. <u>However, [Uncle] has not demonstrated stability for the [C]hildren. His living situation and his finances are unstable and he does not have a driver's license to take the [C]hildren to all of their appointments. It has been reported that [Uncle] owes a substantial amount of back child support which is why he is unable to get a driver's license</u>. The DHS has made the decision for the [C]hildren to continue to reside with [Aunt]. The [C]hildren are very bonded to [Aunt] and it appears that their needs are being met. [Aunt] has expressed her willingness to adopt [the Children].

(Emphasis added). The DHS Social Worker testified that, after drafting the Permanent Plan, she looked into the possibility of adoption by Uncle, per his request, and she sent him a packet of materials to fill out and confirmed he received it, but Uncle thereafter failed to respond. Thus, the record indicates that the DHS did in fact explore a possible adoption by Uncle, but it could not further pursue that option due to Uncle's lack of follow through.

The Permanent Plan was also consistent with the statutory presumptions in HRS § 587A-33(a)(3)(A) and (B), which, respectively, "[p]resume that it is in the best interests of the child to be <u>promptly and permanently placed</u> with responsible and competent substitute parents and family in <u>a safe and secure home</u>" and "[g]ive greater weight to the presumption <u>that the permanent plan is in the child's best interest, the younger the child is upon the child's date of entry</u> into foster care . . . ." (Emphases added). Here, Daughter entered into foster care when she was less than one-week old and Son entered foster care when he was just over a year old, and the Children had been in foster care for nearly three years by the time of trial. <u>See</u> FOFs 23-26. Given their age of entry into foster care and their length of time in foster care, specifically that they had been under Aunt's care for the entirety of the case, the Family Court may

13

presume that the proposed adoption by the Aunt as indicated in the Permanent Plan was in their best interest. HRS § 587A-33(a)(3)(B). Therefore, the Family Court's conclusions in COLs 12 and 13, that the Permanent Plan was in the Children's best interest, were not wrong. See Doe, 95 Hawaiʻi at 190, 20 P.3d at 623.

Father's argument that he had the right to consent to adoption lacks merit. Father relies on HRS § 587A-15(c)(2) (2018), which provides:

> Unless otherwise provided in this section or as otherwise ordered by the court, a child's family shall retain the following rights and responsibilities after a transfer of temporary foster custody or foster custody . . . .
>
> . . . .
>
> (2) The right to consent to adoption . . . .

(Emphasis added). Father also cites to the concurrence in In re AS, 132 Hawaiʻi 368, 390, 322 P.3d 263, 285 (2014) (Acoba, J., concurring), for the proposition that "Kinship, as exemplified in the statutes, is an anchoring proposition in the sea of circumstances considered in the decision as to adoption, legal guardianship or permanent custody," and argues that the Family Court may weigh kinship as a "substantial factor" in considering permanent placement. Under HRS § 587A-15(c)(2), however, parents only retain the right to consent to adoption while the child is still in foster custody. See HRS § 587A-15(c) ("[A] child's family shall retain the [right to consent to adoption] after a transfer of temporary foster custody or foster custody[.]") and (d) ("If an authorized agency has permanent custody, it has the following duties and rights: . . . . (7) Providing consent to adoption . . . .); see, e.g., Matter of QH, No. CAAP-20-0000040, 2021 WL 1943258, at *2 (Haw. App. May 14, 2021) (SDO) (holding that the father "only retained the right" under HRS § 587A-15(c)(2) to consent or withhold consent for a child's major medical treatment "while [the child] was in foster custody").

While a Family Court may consider kinship in determining a child's best interests for a permanent placement, the In re AS majority held that no relative preference exists with regard to permanent placements.  132 Hawaiʻi at 383, 322 P.3d at 278. Thus, Father presents no authority supporting his assertion that a parent retains the right to consent to an adoption that occurs after the Family Court terminates parental rights and awards permanent custody to the DHS.

### "6 Month Break" challenge

Father's second argument challenges FOFs 47, 56-60, and 62,[7] contending that the Family Court erred in finding that the

---

[7]    FOFs 47, 56-60, and 62 provide:

47.   Father's lack of progress in addressing the problems that necessitated the Children's removal in November of 2017, in spite of the opportunity to do so over the preceding 35 months shows that Father will not become willing and able to provide a safe family home for the Children within the reasonably foreseeable future, even with the assistance of a service plan.

. . . .

56.   Under the circumstances presented by this case, the DHS has exerted reasonable and active efforts to reunify the Children with Mother and Father by identifying necessary, appropriate, and reasonable services to address the identified safety issues, and making appropriate and timely referrals for these services.

57.   Under the circumstances presented by the instant case, the DHS gave Mother and Father every reasonable opportunity to succeed in remedying the problems which put the Children at substantial risk of being harmed in the family home and to reunify with the Children.

58.   Under the circumstances presented in this case, the DHS treated Mother and Father fairly and serviced the entire family intensely since the start of the DHS and Court intervention with this family.

59.   The DHS actively encouraged Mother and Father to participate in necessary and reasonable services to allow them to reunify with the Child [sic].

60.   None of the underlying facts and data upon which the DHS based its opinions, assessments and recommendations
(continued...)

15

DHS's "6 month break from actively engaging in reunification efforts" from April 2020 until the October 2020 trial constituted "reasonable efforts." Father claims that the DHS failed to refer any services during this time frame, and he thus had no opportunity to participate in services. The DHS Social Worker, however, testified that she attempted to contact Parents "monthly" but when she called, they did not answer and "that's just how they've been throughout the duration of the case." While the DHS must provide parents a reasonable opportunity for reunification through a service plan, "a claim for additional services and accommodations must be timely made," and there is no "cognizable procedural complaint" when a request for services is not made until trial. In re Doe, 100 Hawaiʻi at 343-44, 60 P.3d at 293-94. Here, Father does not contend that he requested any additional services after April 2020, and nothing in the record indicates that he raised the issue at any time prior to trial. Under "such circumstances," we "cannot hold that [Father] has any cognizable procedural complaint." Id. at 344, 60 P.3d at 294.

Father's complaint regarding this six-month time frame from April to October 2020, also lacks merit because the reasonable statutory time frame of two years to address Father's safety issues to provide a safe family home for the Children, had already been exceeded. See HRS 587A-33(a)(2). "[N]othing in HRS chapter 587 or in its legislative history . . . indicates that DHS must engage in attempts at reunification for a [particular]

---

[7](...continued)
were shown to be unreliable or untrustworthy. The DHS' continuing assessments in the case were conducted in an appropriate manner.

. . . .

62. During the pendency of this case neither Mother nor Father requested referrals for services from the DHS nor did they object to the Court's findings that the DHS exerted reasonable efforts to reunify Mother and/or Father with the Children.

period . . . before its efforts may be deemed 'reasonable.'"  In re Doe, 100 Hawaiʻi at 344 n.15, 60 P.3d at 294 n. 15.  By April 2020, the Children had been in foster care for more than two years from their December 1, 2017 entry into foster care.

**Remaining FOF and COL challenges**

Finally, we address Father's challenges to FOFs 9, 41, 46, 51-53, 63 and COLs 3, 10 and 11.[8]  As to FOF 9, Father's argument that there was no evidence presented that he was an "IV drug" user misstates the finding, which was that Mother had reported that Father was an IV drug user.  This evidence was contained in the DHS's first Safe Family Home Report, and was supported by substantial evidence.  As to FOF 41, Father disputes the characterization of his substance abuse as "chronic," and claims that there was no evidence that his substance use posed a risk of harm to the Children.  This challenge is not meritorious given that Father stipulated to the Petition; Father's admission during an assessment that he used methamphetamine for over 15 years; and the entirety of the documented substance abuse history in this case, which supports the Family Court's use of the term "chronic" to describe Father's drug use.  See HRS § 587A-28(d)(1),(e)(1) (2018); State v. Miyazaki, 64 Haw. 611, 616, 645 P.2d 1340, 1344 (1982).

As to FOF 46, Father argues that the DHS Social Worker's testimony did not establish that he could not provide a safe family home with or without the assistance of a service plan.  Father also challenges FOF 63, which found that the DHS Social Worker was a "credible expert witness . . . whose testimony was helpful to the court."  The Family Court, as the

---

[8]  As to FOFs 51-53 and COLs 10-11, Father raises only a sufficiency of evidence challenge without supporting argument.  These challenges are waived.  HRAP Rule 28(b)(7).

We agree that COL 3 was wrong, as it referenced a witness named "Corinne Ready" who was not involved in this case.  We conclude that the error is inadvertent and harmless, as it did not affect the Family Court's decision to terminate parental rights.  See HFCR Rule 61.

factfinder, based its finding on the "credible expert testimony" of the DHS Social Worker, and we do "not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence" as this is the province of the factfinder.  In re Doe, 95 Hawaiʻi at 190, 20 P.3d at 623.

Therefore, IT IS HEREBY ORDERED that the Order Terminating Parental Rights, entered November 9, 2020, in the Family Court of the First Circuit, is affirmed.

DATED:  Honolulu, Hawaiʻi, August 30, 2021.

On the briefs:

Tae Chin Kim
for Appellant Mother

Jacob G. Delaplane
for Cross-Appellant Father

Kurt J. Shimamoto
Deputy Attorney General
for Appellee Department of
Human Services

Emily M. Hills
(Legal Aid Society of Hawaiʻi)
for Guardian Ad Litem

/s/ Lisa M. Ginoza
Chief Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Karen T. Nakasone
Associate Judge